UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| FORTRESS SECURE SOLUTIONS, LLC, a Washington Limited Liability Company,<br><br>              Plaintiff,<br><br>   v.<br><br>ALARMSIM, LLC, et al.,<br><br>              Defendants. | NO. 4:17-CV-5058-TOR<br><br>ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT FOR FAILURE TO STATE A CLAIM |

BEFORE THE COURT is Defendants' Motion to Dismiss Plaintiff's

Second Amended Complaint for Failure to State a Claim. ECF No. 75. This

matter was submitted for consideration without oral argument. The Court has

reviewed the record and files herein, and is fully informed. For the reasons

discussed below, Defendants' Motion to Dismiss Plaintiff's Second Amended

Complaint for Failure to State a Claim (ECF No. 75) is **GRANTED in part** and

**DENIED** in part.

//

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTION TO DISMISS ~ 1

# BACKGROUND

On April 28, 2017, Plaintiff Fortress Secure Solutions, LLC ("Fortress") filed a Complaint alleging false designation of origin, dilution, intentional and/or negligent misrepresentation, breach of agreement, violations of RCW 19.86 *et seq.*, and civil conspiracy. ECF No. 1 at ¶¶ 27-61. On August 18, 2017, each Defendant filed a motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(3). ECF Nos. 17; 18; 19; 20. The Court denied Defendant AlarmSIM, LLC ("AlarmSIM") and Defendant Ricky Guthrie Jr.'s Motions to Dismiss. ECF No. 46. The Court granted Defendant Ricky D. Guthrie Sr. and Defendant Eduardo Ramirez's Motions to Dismiss, terminating these defendants from the matter. *Id.*

On January 8, 2018, Plaintiff filed an Amended Complaint, alleging false designation of origin, dilution, intentional and/or negligent misrepresentation, breach of agreement, violations of RCW 19.86 *et seq.*, civil conspiracy, tortious interference with contractual relationships/business expectancy, and alter ego/piercing liability. ECF No. 51 at 9-15. On January 23, 2018, Defendants AlarmSIM and Guthrie Jr. filed a Motion to Dismiss for Failure to State a Claim. ECF No. 55. On March 21, 2018, the Court granted Defendants' Motion, dismissing Plaintiff's Amended Complaint with leave to amend. ECF No. 64.

On May 21, 2018, Plaintiff filed a Second Amended Complaint. ECF No. 74. Plaintiff alleges the following causes of action: (1) false designation of origin;

1  (2) unfair competition and false advertising; (3) common law unfair competition;

2  (4) defamation; (5) tortious interference with existing contractual relationships; (6)

3  tortious interference with business expectancy; (7) unjust enrichment; (8)

4  intentional and/or negligent misrepresentation; (9) breach of agreement; and (10)

5  violations of RCW 19.86 *et seq. Id.* at ¶¶ 56-121.  Plaintiff also seeks to declare

6  AlarmSIM the alter ego of Guthrie Jr.  *Id.* at ¶¶ 122-127.  On June 4, 2018,

7  Defendants filed the instant Motion to Dismiss.  ECF No. 75.

## FACTS

8  

9      The following facts are drawn from Plaintiff's Second Amended Complaint

10  and are accepted as true for the purposes of the instant motion.  Fortress is a

11  Washington limited liability company that owns and operates a retail, internet-

12  based home security alarm business.  ECF No. 74 at ¶¶ 1, 9.  AlarmSIM is a North

13  Carolina limited liability corporation organized in 2014 and administratively

14  dissolved in 2016.  *Id.* at ¶ 2.  It was a retail, internet-based SIM card and home

15  security alarm business.  *Id.* at ¶ 20.  AlarmSIM sold their products on certain

16  websites, which resulted in at least 126 sales to residents of Washington State.  *Id.*

17  at ¶ 24.  Guthrie Jr. is an officer, member, and control person of AlarmSIM.  *Id.* at

18  ¶ 3.  Guthrie Jr. owned a 40% membership interest in AlarmSIM and did business

19  as AlarmSIM from 2012 until its dissolution, including in 2017.  *Id.*

20

On November 11, 2013, Fortress claims that Guthrie Jr. contacted Fortress's President Michael Hofeditz regarding the compatibility of its SIM cards with Fortress's security system. *Id.* at ¶ 27. Fortress alleges that Guthrie Jr. falsely represented that AlarmSIM offered top notch customer service and would take good care of Fortress's customers should it recommend AlarmSIM SIM cards to its customers. *Id.* Hofeditz promised and agreed that Fortress would recommend and promote the use of the AlarmSIM SIM card to its customers to be used in conjunction with Fortress security systems so long as AlarmSIM provided SIM cards and customer service to Fortress's customers. *Id.* at ¶ 28. Guthrie Jr. agreed to these terms and promised that AlarmSIM would supply "state of the art" SIM cards and "top notch" customer service to Fortress's customers in exchange for Fortress's promise to recommend the AlarmSIM SIM card to its customers. *Id.* Fortress states that it reasonably relied on Guthrie Jr.'s false representations and, in the absence of these representations, would not have entered the subject agreement with Defendants. *Id.* at ¶ 30.

Fortress contends that AlarmSIM then gained access to its customers' addresses and contact information, which included over 100 residents of Washington State. *Id.* at ¶ 31. In 2014 and 2015, Fortress referred hundreds of customers to Defendants by phone, email, and other methods. *Id.* at ¶ 32. Fortress states that its customers constituted over 75% of AlarmSIM's business during 2014

and 2015. *Id.* Fortress insists that at all relevant times, Defendants had actual knowledge that Fortress was referring customers to AlarmSIM. *Id.* at ¶ 33. In 2014 and 2015, AlarmSIM offered a discount to Fortress's customers who used the coupon code "FORTRESS" at check out. *Id.* AlarmSIM also advertised during this period that its SIM card was "guaranteed" to work with Fortress alarm systems. *Id.* Additionally, Fortress asserts that AlarmSIM obtained technical information concerning its security systems. *Id.* at ¶ 34. Fortress states that it supplied this information in reliance on Guthrie Jr.'s representations that the data was necessary to assist joint customers. *Id.*

In December 2015, Guthrie Jr. and AlarmSIM entered all of Fortress's customers' names and email addresses into an email marketing platform through Constant Contact. *Id.* at ¶ 36. On December 14, 2015, Guthrie Jr. and AlarmSIM purposely sent an email to all of Fortress's customers who had purchased the AlarmSIM SIM card and falsely represented that Fortress's security alarm panels were obsolete and that Fortress had "been either slow or absent" in addressing its customers concerns.[1] *Id.* Fortress states that AlarmSIM falsely claimed in all

---

[1] The Court noted in a prior order that the email states "existing companies" were slow or absent in their response and does not mention Fortress by name. ECF Nos. 64 at 5 n.1; 46 at 5; 36-1 at 9 (Ex. C).

capital letters that there was a "SERIOUS RISK TO THE PROPER

FUNCTIONING OF YOUR SECURITY SYSTEMS." *Id.* Fortress alleges that

Defendants falsely advertised in the email to Fortress's customers that AlarmSIM

created a new "revolutionary" security alarm panel for use by Fortress's customers.

*Id.* at ¶ 37. Fortress states that this panel had never actually been developed and

Defendants falsely compared the panel "to what was currently on the market what

a computer is to a calculator." *Id.*

AlarmSIM also offered a live chat as part of its alleged defamatory

marketing campaign. *Id.* at ¶ 38. Fortress contacted the live chat line, which stated

that the system is "specifically designed to replace the Fortress systems" and was

"designed to work with Fortress's accessories." *Id.* Fortress claims that it received

numerous communications from customers seeking assurance that Fortress's

security systems were functional, causing Fortress to lose customers, lose revenue,

and devote substantial staff resources and expense to address these issues. *Id.* at ¶

39. Fortress contends that AlarmSIM sent a copy of its December 2015 email to at

least 80 of Fortress's customers who resided in Washington. *Id.* at ¶ 40.

On December 23, 2015, Guthrie Jr. contacted Fortress by email and asked

Fortress to supply additional information concerning its security systems under the

guise that this information would be helpful to resolve issues with individuals that

AlarmSIM and Fortress "share as customers." *Id.* at ¶ 41. Guthrie Jr. further

requested a sample of Fortress's new unit for AlarmSIM to "have on hand" in order to help "support users of that devise." *Id.*

In late December 2015, Fortress forwarded to AlarmSIM a cease and desist letter concerning the 2015 email. *Id.* at ¶ 42. Defendants refused to take any steps to retract the false statements contained in the email and suggested that they would file a lawsuit against Fortress for libel in the event Fortress sent further cease and desist letters. *Id.* at ¶ 43. Guthrie Jr. then permitted AlarmSIM to be dissolved and transferred all of the assets of AlarmSIM to himself in an attempt to defeat the claims of AlarmSIM's creditors, including Fortress, and continued to personally do business as "AlarmSIM" and "Prepaid Security Systems." *Id.* at ¶ 44.

Additionally, Fortress notes that it contracted with Shenzhen Secrui Electronics Co., Ltd., based in Shenzhen China ("SSE") to design the Kerui G19 security panel and related proponents. *Id.* at ¶ 12. Fortress states that it was instrumental in assisting SSE to design the Fortress Panel and Fortress Components to Fortress's specifications. *Id.* at ¶ 13. In early 2016, Defendants began to advertise and sell their new security panel, which was marketed as part of the AlarmSIM Advanced Security System Starter Kit. *Id.* at ¶ 45. Fortress alleges that this kit is identical in both design and trade dress to the Fortress Total Security Basic Model. *Id.* Defendants marketed and sold the kit in interstate commerce in 2016 via their "Amazon aStore" and their website. *Id.* at ¶ 47. Fortress states that

the panel was actually the Kerui G19 security panel, which Defendants have acquired from an unknown source in China. *Id.* at ¶ 48. SSE did not give license or permission to Defendants to market or sell this panel or to incorporate this panel in any of their products. *Id.* at ¶ 49.

Fortress also alleges that in 2014, 2015, and 2016, AlarmSIM SIM card routinely failed to function properly with Fortress security systems, causing the SIM cards to stop functioning, service outages, and SIM card malfunctions. *Id.* at ¶ 51. Fortress asserts that many customers complained that they were unable to reach anyone at AlarmSIM's apparently non-existent call center or receive any response to their emails. *Id.* at ¶ 52. Fortress insists that this lack of response was directly contrary to the promises made by Guthrie Jr. and forced Fortress to incur considerable expense addressing problems with the AlarmSIM SIM cards. *Id.* Fortress states that it had to provide customer support for AlarmSIM in order to keep Fortress's customers' security systems functioning. *Id.* When AlarmSIM did respond to customer complaints, it attempted to conceal its failings by allegedly falsely and slanderously suggesting to Fortress's customers that AlarmSIM SIM cards would not function properly as its security systems were "cheap" and contained "dated firmware and capacities." *Id.* at ¶ 53.

Fortress alleges that it suffered loss of business, lost profits, loss of business reputation, loss of goodwill, and other like and serious harm. *Id.* at ¶ 54. It was

1    also forced to incur substantial expenses in responding to customer concerns and

2    developing its own SIM card for its security systems. *Id.* at ¶¶ 54-55.

3                                    **DISCUSSION**

4         Federal Rule of Civil Procedure 12(b)(6) provides that a defendant may

5    move to dismiss a complaint for "failure to state a claim upon which relief can be

6    granted." Fed. R. Civ. P. 12(b)(6). To survive dismissal, a plaintiff must allege

7    "sufficient factual matter, accepted as true, to 'state a claim to relief that is

8    plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell*

9    *Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This requires the plaintiff to

10   provide "more than labels and conclusions, and a formulaic recitation of the

11   elements." *Twombly*, 550 U.S. at 555. When deciding, the court may consider the

12   plaintiff's allegations and any "materials incorporated into the complaint by

13   reference." *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1061

14   (9th Cir. 2008) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308,

15   322 (2007)). A plaintiff's "allegations of material fact are taken as true and

16   construed in the light most favorable to the plaintiff[,]" but "conclusory allegations

17   of law and unwarranted inferences are insufficient to defeat a motion to dismiss for

18   failure to state a claim." *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1403 (9th Cir.

19   1996) (citation and brackets omitted).

20

Under Rule 15(a) of the Federal Rules of Civil Procedure, leave to amend a party's pleading "should [be] freely give[n] . . . when justice so requires," because the purpose of the rule is "to facilitate decision on the merits, rather than on the pleadings or technicalities." *Novak v. United States*, 795 F.3d 1012, 1020 (9th Cir. 2015) (citation omitted). "[A] district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc).

## 1. False Designation of Origin

Plaintiff alleges that it is the owner of the trade dress embodied in the Fortress Total Security Basic Model. ECF No. 74 at ¶¶ 57, 14-15. Plaintiff asserts that Defendants' unauthorized use in commerce of the trade dress constitutes a false designation of origin in violation of 15 U.S.C. § 1125(a)(1)(A). *Id.* at ¶ 65.

The Lanham Act imposes civil liability on "[a]ny person who, on or in connection with any goods or services, or any container for goods, uses in commerce … any false designation of origin" that "is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person." Lanham Act, § 43(a) (codified at 15 U.S.C. § 1125(a)(1)(A)). Under § 43(a) of the Lanham Act,

"the ultimate test is whether the public is likely to be deceived or confused by the similarity of the marks." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 780 (1992) (Stevens, J., concurring).

To recover under the Lanham Act for infringement of trade dress, a plaintiff must prove: (1) the trade dress features at issue are nonfunctional; (2) the trade dress is inherently distinctive or has acquired distinctiveness through secondary meaning; and (3) consumers are likely to confuse the plaintiff's product with the defendant's accused device. *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1258 (9th Cir. 2001) (citing *Disc Golf Ass'n, Inc. v. Champion Discs, Inc.*, 158 F.3d 1002, 1005 (9th Cir. 1998)).

### A. Nonfunctional

Plaintiff asserts that the trade dress is nonfunctional. ECF No. 74 at ¶ 60. Plaintiff contends that the AlarmSIM Advanced Security System Starter Kit unlawfully uses each nonfunctional design feature of the trade dress, as its panel and components are exact reproductions of the Fortress Panel and Fortress Components. *Id.* at ¶ 62.

When a trade dress is not registered on the principal register, the person who asserts trade dress protection has the burden of proving the matter sought to be protected is not functional. 15 U.S.C. § 1125(a)(3). A component is considered "functional and cannot serve as a trademark if the product feature is essential to the

use or purpose of the article or if it affects the cost or quality of the article, that is, if exclusive use of the feature would put competitors at a significant, non-reputation-related disadvantage." *Clicks Billiards*, 251 F.3d at 1258 (quoting *Qualitex Co. v. Jacobson Prods. Co., Inc.*, 514 U.S. 159, 165 (1995)). In determining functionality, the Court examines the trade dress as a whole, bearing in mind that "[t]rade dress is the composite tapestry of visual effects." *Id.* at 1259.

The Court considers several factors in determining whether trade dress is functional: "(1) whether the design yields a utilitarian advantage, (2) whether alternative designs are available, (3) whether advertising touts the utilitarian advantages of the design, and (4) whether the particular design results from a comparatively simple or inexpensive method of manufacture." *Id.* at 1260 (quoting *Disc Golf Ass'n, Inc.*, 158 F.3d at 1006).

Defendants insist that virtually all of the alleged trade dress is functional in nature. ECF No. 75 at 5. Defendants emphasize Plaintiff[2] asserts that the "white plastic shell" is protectable trade dress, but Defendants argue that the shell is nothing more than a protective layer over the electronics inside the shell. *Id.*

---

[2]     The Court infers that Defendants mistakenly refer to Plaintiff as "Defendant" in their argument. *See* ECF No. 75 at 5. This mistake also occurs later in Defendants' Motion. *See id.* at 8.

Defendants argue that the number and control buttons are functional for purposes of identifying specific buttons. *Id.* Defendants state that the "[e]ight programming menu displays" serve to perform functions on the device itself. *Id.*

Plaintiff responds that "Defendants have made no attempt to analyze the Trade Dress as a whole, contenting themselves instead to point to certain discrete features of the Trade Dress." ECF No. 79 at 14. Plaintiff insists that Defendants make no attempt to claim that alternative designs and layouts for home security systems are unavailable, as the market is well populated with home security systems that use different colors, shapes, sizes, images, icons, and fonts which provide all of the necessary functionality. *Id.* Plaintiff argues that the trade dress constitutes ornamental attributes of the Fortress panel and components, making it nonfunctional. *Id.*

Defendants then argue that the shell functions solely as an electronic enclosure, making it essential for users to handle, mount, and operate the product without exposing the encased electronics. ECF No. 81 at 2. Defendants assert that the numbering and controls on the front panel, as well as the display itself, are essential to the functioning of the product because the users would be unable to configure and operate the product without them. *Id.* Defendants contend that the buttons and display are not merely ornamental, but users would have no way to

turn the product on or off, customize the settings, or otherwise program the product to operate as advertised without these features. *Id.*

The Court finds that in viewing the trade dress as a whole, the features may be considered nonfunctional. While Defendants argue that the white shell and buttons are functional to form a protective layer and identify specific buttons, the components may also be considered nonfunctional as there are various ways to design the appearance of a security panel. The Court does not consider each specific feature, as argued by Defendants, because "[t]rade dress is the composite tapestry of visual effects." *Clicks Billiards*, 251 F.3d at 1259.

The Court is then persuaded that Plaintiff provides sufficient evidence to show that the trade dress may have more than a utilitarian advantage and that the design does not merely result from a simple or inexpensive method of manufacturing. There no evidence at this time that finding a trademark for the product features would put competitors at a significant disadvantage. When viewing the facts in the light most favorable to Plaintiff, the Court determines that Plaintiff sufficiently pleads a claim that the features of the trade dress are potentially nonfunctional.

**B. Secondary Meaning**

Plaintiff alleges that the trade dress is inherently distinctive. ECF No. 74 at ¶ 58. Plaintiff states that the nonfunctional features of the trade dress have been

1  stable and consistent in appearance in each instance of its use by Fortress. *Id.* at ¶

2  59. Plaintiff insists that the trade dress acquired distinctiveness because it has

3  come to be recognized as a source indicator by the consuming public, who

4  associate the trade dress with Fortress's security systems. *Id.*

5  Plaintiff must show "that the mark has become identified with the

6  manufacturer by acquiring a 'secondary meaning.'" *Fleischer Studios, Inc. v.*

7  *A.V.E.L.A., Inc.*, 654 F.3d 958, 967 (9th Cir. 2011) (quotation omitted). "The basic

8  element of secondary meaning is a mental recognition in buyers' and potential

9  buyers' minds that products connected with the [mark] emanate from or are

10  associated with the same source." *Id.* (quoting *Levi Strauss & Co. v. Blue Bell,*

11  *Inc.*, 632 F.2d 817, 820 (9th Cir. 1980)).

12  Defendants emphasize that SSE "designed and manufactured the Kerui G19

13  security panel … for use by Fortress." ECF Nos. 75 at 6; 74 at 40 (Ex. E).

14  Defendants argue that the critical fact is that Plaintiff's product is the Kerui G19

15  Panel merely rebranded with a different logo. ECF No. 75 at 6. While Plaintiff

16  asserts it has an exclusive license to sell the panel in the United States, Defendants

17  contend that the problem for Plaintiff is that the Kerui panel is the same product

18  and is actively sold on American websites such as Amazon. *Id.* Defendants then

19  insist that there is not exclusivity as to Fortress and the trade dress must fail. *Id.*

20

Defendants admit that there are apparent similarities between Plaintiff's and Defendants' products, but Plaintiff's products are also virtually indistinguishable from those of Kerui.[3]  *Id.* at 8.  Defendants also argue that there is absolutely nothing unique about Plaintiff's white plastic shell, as numerous products employ white plastic exteriors specifically so that the product does not stand out and instead can integrate with virtually any décor.  *Id.*  Additionally, Defendants emphasize that Plaintiff does not demonstrate any evidence of secondary meaning in the mind of consumers.  *Id.* at 9.

Plaintiff responds that whether the trade dress has acquired secondary meaning is a factual issue that may not be decided at this stage of the proceeding.  ECF No. 79 at 16.  Plaintiff argues that Defendant makes no effort to contest Plaintiff's allegations that it has extensively advertised and promoted its products, and that the nonfunctional design components have come to be recognized as a source indictor for the consuming public.  *Id.* at 15-16.  Plaintiff also asserts that Defendants' own conduct supports a finding of secondary meaning because

---

[3]     The Court does not consider the visual comparison of the Kerui products offered by Defendants, as the Court only considers the facts alleged in Plaintiff's Second Amended Complaint.  *See* ECF Nos. 75 at 7-8; 79 at 15 n.11.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTION TO DISMISS ~ 16

Defendants do not deny that they have copied every element of the trade dress.  *Id.* at 16.

Defendants reply that "no amount of advertising can magically create secondary meaning where none exists."  ECF No. 81 at 2-3.  Defendants insist that countless other white plastic security systems, including the Kerui panel, saturate the marketplace and a white plastic security system is incapable of indicating a specific source without an accompanying brand name.  *Id.* at 3.

The Court finds that Plaintiff sufficiently asserts that the trade dress has acquired secondary meaning.  The Court acknowledges Defendants' argument that Plaintiff's trade dress may resemble the Kerui panel, which may be sold in the United States.  *See* ECF No. 75 at 6.  Yet, Plaintiff argues that it has the exclusive license to market the panel in the United States, which the CEO of SSE confirms.  ECF No. 74 at 40 (Ex. E).  The Court is then not persuaded that the Keuri panel "saturates the market" when merely considering Plaintiff's Second Amended Complaint.  Viewing the facts in the light most favorable to Plaintiff, the Court finds that Plaintiff provides sufficient evidence that buyers may associate the alleged trade dress with Fortress's panel.  Plaintiff advertised the nonfunctional features of its panel and allegedly has exclusive rights to market this panel in the United States.

//

### C. Confusion

Plaintiff insists that Defendants' unauthorized use of the trade dress is "likely to cause confusion, to cause mistake, or to deceive as to the affiliation, connection, or association of AlarmSIM with Fortress and/or as to the origin, sponsorship, or approval by Fortress of AlarmSIM's goods." ECF No. 74 at ¶ 65. Plaintiff states that this confusion will irreparably harm Fortress and the goodwill that it has developed in the trade dress. *Id.*

Plaintiff emphasizes that Defendants fail to address this third factor. ECF No. 79 at 12 n.9. Defendants also do not consider this issue in their reply. *See* ECF No. 81 at 3. The Court then finds that Plaintiff sufficiently pleads confusion because Plaintiff allegedly has the exclusive right to market this panel in the United States and advertised its nonfunctional design, which buyers may associate with the Fortress panel. *See* ECF No. 74 at ¶¶ 16-18.

Accordingly, the Court finds that Plaintiff states a claim for false designation of origin that is plausible on its face.

### 2. Unfair Competition and False Advertising

Plaintiff alleges unfair competition and false advertising under § 43(a)(1)(B) of the Lanham Act and Washington common law. ECF Nos. 74 at ¶¶ 68-86; 79 at 16. Plaintiff states that by way of the 2015 email and live chat, Defendants purposely, knowingly, intentionally, and maliciously made false representations.

ECF No. 74 at ¶ 70.  These false representations include that Plaintiff's security alarm panels were obsolete, Plaintiff has either been slow or absent in addressing customers' concerns related to its panels, and there existed a serious risk to the proper functioning of Plaintiff's security panels.  *Id.*  Plaintiff also alleges that Defendants falsely claimed they had created a revolutionary security panel, that this nonexistent security panel was capable of replacing Fortress's security systems, and that the panel would work with Fortress's components.  *Id.*

The elements of a Lanham Act § 43(a) false advertising claim are:

> (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a lessening of the goodwill associated with its products.

*Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997).  A plaintiff must show that "the statement was literally false, either on its face or by necessary implication, or that the statement was literally true but likely to mislead or confuse consumers."  *Id.* (citation omitted).  The elements of false advertising under the Lanham Act are identical to the elements of unfair competition under Washington common law, and this Court will thus consider the claims together.

ECF No. 79 at 17; *Cascade Yarns, Inc. v. Knitting Fever, Inc.*, No. C10-861 RSM, 2015 WL 3407882, at *7 (W.D. Wash. May 27, 2015).

Here, Defendants emphasize the Court has already recognized that the email alleged to contain misrepresentations about Plaintiff's product does not mention Plaintiff's product by name. ECF Nos. 75 at 10; 64 at 27. Defendants state that the email refers generically to the customer's security system and specifically addresses those who are having issues with their current security system. ECF No. 75 at 10. Defendants insist that the implication that the statements in the email specifically refer to Plaintiff's product is unwarranted. *Id.* at 11. Defendants contend that their conduct is merely competition in the marketplace. *Id.*

In regards to the allegation that Defendants' product is revolutionary and nonexistent, Defendants argue that even assuming the statements in the email are false, Plaintiff still fails to state a claim for unfair competition and false advertising because it has not alleged facts to support the second and third elements of the claim. *Id.* Defendants state that Plaintiff does not offer any fact to suggest that any person or a "substantial segment of the market" was actually deceived into thinking that Plaintiff's system was obsolete or that Defendants had a revolutionary product. *Id.* Defendants insist that Plaintiff offers mere speculation that the representations "have influenced and will likely continue to influence the

purchasing decision of persons" who received the communication. ECF Nos. 75 at 11; 74 at ¶ 75.

Defendants argue that the live chat is a conversation with one person and no statement made during the live chat denigrates or misrepresents Plaintiff's product. ECF No. 75 at 11-12. Defendants emphasize that the live chat participant is not convinced because he or she states that "something really doesn't seem right here. I will be contacting Fortress so they know about this." ECF Nos. 75 at 12; 36-1 a 12 (Ex. D). Defendants then assert that the email and live chat did not deceive anyone about Plaintiff's product. ECF No. 75 at 12. Additionally, Defendants note that Plaintiff has not identified any person who has purchased Defendants' products instead of its own. *Id.* Defendants contend that Plaintiff made a "bare, conclusory allegation that it has lost sales without any factual basis for that statement." *Id.*

Plaintiff responds that Defendants knew that at least three out of every four emails that Defendants sent were going to Fortress's customers. ECF No. 79 at 17. Plaintiff contends that Defendants' incentive was to sell their own alarm systems, which were "specifically designed to replace the Fortress systems." ECF Nos. 79 at 18; 36-1 at 12. Plaintiff then argues that under these circumstances, a reasonable jury could decide that Defendants intentionally targeted Plaintiff's products and services with their defamatory and misleading statements. ECF No. 79 at 18.

1    Plaintiff also states that it is not required to show that Defendants' false

2    statements actually deceived anyone, but whether the statements had the tendency

3    to deceive.  *Id.*  Plaintiff argues that it is a factual issue as to whether these

4    statements had the tendency to deceive consumers.  *Id.*  Plaintiff also asserts that it

5    specifically alleged that its customers were actually deceived because Plaintiff

6    received "numerous communications from panicked and irate customers seeking

7    assurances that Fortress's security systems were functional and assurances that

8    Fortress's systems would meet their needs in the future."  *Id.*

9    Defendants counter that the word "obsolete" is never used in the email or

10   live chat, and thus Plaintiff's alleged false statement that the security panels were

11   obsolete does not exist.  ECF No. 81 at 3-4.  In regards to Fortress being slow or

12   absent in addressing customer concerns, Defendants insist that a plain reading of

13   the email makes clear that the statement refers to companies' slow response to the

14   phasing out of 2G networks, not to their customers.  *Id.* at 4.  Defendants again

15   emphasize that Fortress was never mentioned in the email.  *Id.* at 3-4.

16   When construing the facts in the light most favorable to Plaintiff, the Court

17   finds that Plaintiff alleges a plausible claim for relief for both its second and third

18   causes of action.  While the email does not clearly identify Fortress by name, it

19   could be reasonable to infer that Defendants' statements were referring to Fortress,

20   as the majority of the emails were sent to Fortress's customers.  Plaintiff argues

that Defendants' email and live chat contained numerous false statements, which may have the tendency to deceive a substantial segment of its audience. This possibility of deception is exemplified in customers contacting Fortress to ensure that their security systems were functional. The parties do not dispute that the alleged false statements entered interstate commerce and the Court does not address this issue. Plaintiff has also sufficiently pled that it may be injured or suffer from a lessening of goodwill associated with its products. *See* ECF No. 74 at ¶ 54. The Court then finds that Plaintiff satisfies the minimum standard to overcome a motion to dismiss.

While Defendants asserts that the word "obsolete" never occurs in the email or live chat, Plaintiff's allegation may be inferred by Defendants' statements comparing its panel to a computer and other panels currently on the market as calculators. *Id.* at ¶ 70. The email also states that "existing companies have been either slow or absent in their response." ECF No. 36-1 at 9. While Defendants may read this statement as referring to the phasing out of 2G networks, it is also plausible to read the statement as referring to existing companies being slow to respond to customer concerns regarding the proper functioning of their security systems. This is an issue best left to the trier of fact as there are multiple plausible interpretations of this statement and Plaintiff satisfies the low bar to overcome a motion to dismiss. Defendants' statement that their product is "revolutionary"

could be an example of exaggerated advertising, or a false statement if Plaintiff's allegation is taken as true that the panel did not exist. Plaintiff then defeats a motion to dismiss with this plausible interpretation. The Court is not persuaded by Defendants' arguments that Plaintiff did not allege sufficient facts to state a plausible claim for relief on the merits.

### 3. Defamation

#### A. Statute of Limitations

Plaintiff alleges that the 2015 email and the live chat contain defamatory statements. ECF No. 74 at ¶¶ 87-92. Defendants argue that Plaintiff's defamation claim is time-barred. ECF No. 81 at 5. Defamation has a two-year statute of limitations. RCW 4.16.100(1). Defendants assert that Plaintiff's claim is entirely based on the email and live chat of December 2015, and thus the defamation claim must have been raised by December 2017. *Id.* Defendants insist that Plaintiff did not raise this claim until May 2018. ECF Nos. 81 at 6; 74. The parties do not dispute that Plaintiff's claim for defamation arose out of the December 2015 email and live chat. ECF Nos. 81 at 5; 84 at ¶ 3.

Plaintiff argues that its defamation claim relates back to its original pleading under Federal Rule of Civil Procedure 15(c). ECF No. 84 at ¶ 5. Plaintiff insists that the defamation claim asserted in its Second Amended Complaint arises out of the same core of operative facts found in the original Complaint. *Id.* at ¶ 6.

Plaintiff states that Defendants had fair notice of the defamation claim.  *Id.*

Plaintiff concludes that its claim for defamation relates back to the time of the

filing of the original Complaint in April 2017, and is thus timely brought.  ECF

Nos. 84 at ¶ 6; 1.

Federal Rule of Civil Procedure 15(c) provides that "[a]n amendment to a

pleading relates back to the date of the original pleading when … the amendment

asserts a claim or defense that arose out of the conduct, transaction, or occurrence

set out … in the original pleading."  Fed. R. Civ. P. 15(c)(1)(B).  "To relate back,

the original and amended pleadings [must] share a common core of operative facts

so that the adverse party has fair notice of the transaction, occurrence, or conduct

called into question."  *ASARCO, LLC v. Union Pac. R. Co.*, 765 F.3d 999, 1004

(9th Cir. 2014) (quotation and citation omitted).  This doctrine is "liberally

applied."  *Id.* (citation omitted).

Plaintiff's original Complaint stated that AlarmSIM contacted Fortress's

customers and falsely represented that Fortress's security panels were obsolete and

that Fortress was not in a position to service and/or update its products.  ECF No. 1

at ¶ 20.  AlarmSIM also falsely represented that it created a new security alarm

panel for Fortress's customers that was "specifically designed to replace the

Fortress systems."  *Id.*  These allegations relate to the same 2015 email and live

chat that provide the basis for Plaintiff's defamation claim.  ECF No. 74 at ¶¶ 36-

39.  The Court finds that the original and amended pleadings may then share a common core of operative facts, namely Defendants' alleged false representations in the email and live chat.  Plaintiff sufficiently alleges that Defendants may have had fair notice of the alleged defamatory statements.  It is then plausible that Plaintiff may overcome the statute of limitations and the Court addresses the merits of Defendants' argument.

**B. Merits**

The elements a plaintiff must establish in a defamation case are "falsity, an unprivileged communication, fault, and damages."  *Mohr v. Grant*, 153 Wash.2d 812, 822 (2005).  Publication of a defamatory statement to someone other than the person defamed is essential to liability.  *Doe v. Gonzaga Univ.*, 143 Wash.2d 687, 701 (2001), *rev'd on other grounds*, 536 U.S. 273 (2002).  The alleged defamatory statement must also be a statement of fact, not a statement of opinion.  *Life Designs Ranch, Inc. v. Sommer*, 191 Wash. App. 320, 330 (2015) (citation omitted).  A court considers the following factors to determine whether a statement is actionable:  "(1) the medium and context in which the statement was published, (2) the audience to whom it was published, and (3) whether the statement implies undisclosed facts."  *Id.* (quotations and citation omitted).

Here, Defendants argue that statements in an advertisement that a security system is "obsolete," "at risk," and that unnamed competitors are "slow" are

statements of opinion. ECF No. 75 at 14. Defendants contend that the audience was its own customers and its purpose was to sell another product to those customers. *Id.* Defendants assert that customers would expect a certain amount of rhetoric, exaggeration, and hyperbole in an unsolicited advertisement for a new product. *Id.* Defendants state that customers would be in a position to judge for themselves how their own security system was performing and determine whether to avail themselves of the advertised product. *Id.* Defendants insist that there is no false statement in the live chat about Plaintiff's product and the live chat cannot form the basis for a defamation action. *Id.*

Defendants also emphasize that Plaintiff fails to identify any "Additional False Statements" allegedly made about its products. ECF Nos. 75 at 15; 74 at ¶ 90. Defendants argue that these are statements of opinion that the product is "cheap" and the firmware is "dated." ECF No. 75 at 15. Defendants again highlight that Plaintiff does not quote language that mentions Fortress by name. *Id.* Defendants assert that Plaintiff makes a "bald conclusory allegation of damages" that cannot survive a motion to dismiss. *Id.*

Plaintiff responds that Defendants' statements in the email are not merely rhetorical or hyperbole, but are statements which can only be understood as declaring or implying an actual fact of being proved true or false. ECF No. 79 at 19. Plaintiff emphasizes that Defendants stated there was a serious risk to the

proper functioning of customers' security systems. *Id.* Plaintiff also notes that Defendants do not deny that the statements contained in the email were false. *Id.*

The Court finds that Plaintiff states a plausible claim for relief. Plaintiff sufficiently alleges that AlarmSIM solicited a majority of Fortress's customers by falsely representing that their security panels were no longer functioning. While Defendants' email may only be an advertisement to its own customers, Plaintiff alleges sufficient facts at this stage of the proceedings to show that the email could also be defamatory. The statements in the email may falsely imply to Fortress's customers that their panels were not functioning and that it was slow to respond to these issues. When viewing the facts in the light most favorable to Plaintiff, the Court finds that Plaintiff pleads a plausible claim for defamation.

**4. Tortious Interference with Existing Contractual Relationships and Tortious Interference with Business Expectancy**

To prevail on its tortious interference claim, Plaintiff must show: (1) the existence of a valid contractual relationship or business expectancy; (2) that defendants had knowledge of that relationship; (3) an intentional interference inducing or causing a breach or termination of the relationship or expectancy; (4) that defendants interfered for an improper purpose or used improper means; and (5) resultant damages. *Newton Ins. Agency & Brokerage, Inc. v. Caledonian Ins. Grp., Inc.*, 114 Wash. App. 151, 157-58 (2002). A valid business expectancy

"includes any prospective contractual or business relationship that would be of pecuniary value." *Id.* at 158. Intentional interference "denotes purposefully improper interference." *Birkenwald Distrib. Co. v. Heublein, Inc.*, 55 Wash. App. 1, 11 (1989) ("When one acts to promote lawful economic interests, bad motive is essential, and incidental interference will not suffice.") (citations omitted).

Defendants admit that Plaintiff and AlarmSIM did share an overlapping customer base, but argue that this overlap does not lead to the conclusion that Defendants knew which customers also purchased Plaintiff's products. ECF No. 75 at 17. Defendants allege that they could not have known which customers were also in a business relationship with Plaintiff. *Id.* Defendants state that the 2015 email went to its own customers, not some subset of customers that it shared with Plaintiff. *Id.* Defendants argue that the email was sent for the purposes of selling its own products, and it cannot be said that they had any intention of causing a breach or termination of any contract, relationship, or expectancy that Plaintiff then possessed. ECF Nos. 75 at 17; 81 at 6. Defendants then assert that Plaintiff cannot satisfy the third element. ECF No. 75 at 17. Defendants' alleged interference was not for an improper purpose nor was it through improper means, arguing that there is nothing dubious about sending an email to a distribution list of past and current customers for the purpose of selling its own products. *Id.* at 17-18.

Plaintiff argues that at the time the email was sent, Defendants knew that they were sending it to Fortress's customers who had purchased a Fortress product in the past. ECF No. 79 at 20. Defendants also knew they were sending it to customers who Fortress might reasonably expect, based on Fortress's past business relationship with these customers, to do business with it in the future. *Id.* Plaintiff insists that it is "beyond dispute" that Defendants intended to defame Plaintiff's products and services in order to gain an unfair commercial advantage. *Id.*

The Court finds that Plaintiff properly pleads a claim for tortious interference. As discussed below, the Court determines that there may exist a valid agreement, which creates a valid contractual relationship or business expectancy. Plaintiff pleads that Defendants were aware of this relationship because the parties allegedly agreed for Fortress to recommend the AlarmSIM SIM card in exchange for "state of the art" SIM cards and "top notch" customer service. ECF No. 74 at ¶ 28. Defendants had knowledge that Plaintiff was adhering to the agreement. ECF *Id.* at ¶ 33. Plaintiff then alleges that Defendants interfered with that relationship by sending the 2015 email, which was sent to a majority of Fortress's customers.

Defendants' alleged intentional interference could be interpreted as denoting a purposefully improper interference because the email asserted that the customers were at risk to the proper functioning of their security systems, which were outdated calculators. This email then caused Fortress customers to contact Fortress

out of fear that their security systems were not functioning. The live chat is also persuasive to show that Defendants intended to replace Fortress systems. It could be interpreted that Defendants sent this email to encourage Fortress's customers to believe that their security systems were no longer functioning and they should buy Defendants' security systems instead. This purpose could then go beyond mere advertising or puffery to causing people to believe they were no longer safe with their current nonfunctioning security systems. *See* ECF No. 81 at 4-5. Plaintiff alleges sufficient facts to overcome a motion to dismiss, as it is plausible that Defendants acted with a bad motive. *See Birkenwald Distrib, Co.*, 55 Wash. App. at 11. While this email and live chat could merely be competition in the marketplace, the Court must view the facts in the light most favorable to Plaintiff and the Court thus finds that Plaintiff states a plausible claim for relief.

### 5. Unjust Enrichment

Plaintiff alleges that Defendants were "unjustly enriched by the False Statements and Additional False Statements and their sales of the AlarmSIM Advanced Security Starter Kit …." ECF No. 74 at ¶ 106. Under Washington law, unjust enrichment occurs "where money or property has been placed in a party's possession such that in equity and good conscience the party should not retain it." *Lynch v. Deaconess Med. Ctr.*, 113 Wash.2d 162, 166 (1989) (citations omitted). To demonstrate unjust enrichment, Plaintiff must show: "(1) the defendant

receive[d] a benefit, (2) the received benefit is at the plaintiff's expense, and (3) the circumstances make it unjust for the defendant to retain the benefit without payment." *Young v. Young*, 164 Wash.2d 477, 484-85 (2008); *see Bailie Commc'ns, Ltd. v. Trend Bus. Sys., Inc.*, 61 Wash. App. 151, 160 (1991) ("Unjust enrichment occurs when one retains money *or* benefits which in justice and equity belong to another.") (citation omitted and emphasis in original).

Here, Defendants argue that Plaintiff has not set forth the first element for a claim for unjust enrichment. ECF No. 75 at 18. Defendants state that Plaintiff is seeking to disgorge Defendants of a benefit that they received as a result of their contracts with unrelated parties, but unjust enrichment requires a benefit conferred on the Defendants by the Plaintiff. ECF Nos. 75 at 18; 81 at 7. Defendants also assert that it would be just for them to retain payment for a product that they provided to a third party, so Plaintiff has not alleged facts to support the third element. ECF No. 75 at 18.

Plaintiff responds that in the event this Court finds that there was not an agreement between the parties, Plaintiff should be permitted to recover from Defendants the reasonable value of its services in promoting and recommending the AlarmSIM SIM card. ECF No. 79 at 21.

In considering only the facts plead in Plaintiff's Second Amended Complaint, the Court finds that Plaintiff sufficiently pleads a claim for unjust

enrichment. According to Plaintiff's alleged facts, Defendants received a benefit of access to Plaintiff's customers and its referral of the AlarmSIM SIM card. ECF No. 74 at ¶¶ 31-32. The benefit was at Plaintiff's expense because Plaintiff did not receive "state of the art" SIM cards or "top notch" customer service. *Id.* at ¶¶ 51-53. Plaintiff allegedly lost the goodwill of its customers and had to provide its own customer service. *Id.* at ¶ 54. The circumstances could then make it unjust for Defendants to retain the benefit of these customers' information and the sales of the AlarmSIM SIM cards to Fortress's customers. In considering the facts in the light most favorable to Plaintiff, the Court determines that Plaintiff pleads a plausible claim for relief of unjust enrichment for promoting and recommending the AlarmSIM SIM card.

### 6. Intentional and/or Negligent Misrepresentation

Plaintiff alleges that Guthrie Jr. made the following misrepresentations to Hofeditz: (1) that AlarmSIM was well suited for use with Fortress's security systems; (2) that Defendants had the expertise, experience, and resources to offer and continue to offer Fortress's customers "state of the art" SIM cards that were designed for use by home security systems; and (3) that AlarmSIM offered "top notch" customer service, including a fully staffed call center and the capacity to promptly and completely respond to Fortress's customers' inquiries concerning the AlarmSIM SIM card and timely correct issues related to the SIM card. *Id.* at ¶

108.  Plaintiff argues that these material misrepresentations were purposefully made to induce Fortress to enter into a business relationship with Defendants and Fortress reasonably relied on these misrepresentations to its detriment.  *Id.* at ¶¶ 109-10.

To state a claim for fraud or intentional misrepresentation under Washington law, a plaintiff must plead the following elements:  1) representation of an existing fact; 2) materiality; 3) falsity; 4) the speaker's knowledge of its falsity; 5) intent of the speaker that it should be acted upon by the plaintiff; 6) the plaintiff's ignorance of its falsity; 7) the plaintiff's reliance on the truth of the representations; 8) the plaintiff's right to rely upon it; and 9) damages suffered by the plaintiff.  *Stiley v. Block*, 130 Wash.2d 486, 505 (1996).

Under a claim for negligent misrepresentation, a plaintiff "must prove by clear, cogent, and convincing evidence that":  1) defendants supplied false information for the guidance of others in their business transactions; (2) defendants knew or should have known that the information was supplied to guide the plaintiff in his business transactions; 3) defendants were negligent in obtaining or communicating the false information; 4) the plaintiff relied on the false information; 5) the plaintiff's reliance was reasonable; and 6) the false information proximately caused the plaintiff's damages.  *Ross v. Kirner*, 162 Wash.2d 493, 499 (2007).

Here, Defendants argue that Plaintiff has offered no factual support for its allegation that Defendants knew that these statements were false, which is a required element for intentional misrepresentation. ECF No. 75 at 20. Defendants assert that there is insufficient factual support for the allegation that Defendants intended or expected Plaintiff to rely upon the statements made by Guthrie Jr. during the 2013 telephone call. *Id.* Defendants state that the parties did not enter into a valid contract during the telephone call and Guthrie Jr. had no reason to know that Plaintiff would be relying on the language of his sales pitch to take any specific action at that time. *Id.* at 20-21. Defendants contend that the phone call and communications served as AlarmSIM's introduction to Plaintiff in an attempt to forge a business arrangement. *Id.* at 21. Defendants argue that Plaintiff, as a sophisticated business, did not have the right to rely on such broad and undefined terms without any verification or follow up to ascertain the truth of the statements. *Id.*

Plaintiff states that it would not have entered into a business relationship with Defendants without reasonably relying on the false representations discussed above. ECF No. 79 at 23-24. Defendants respond that Plaintiff fails to introduce any evidence tending to show that Guthrie Jr. knew the falsity of his statements. ECF No. 81 at 7.

The Court finds that Plaintiff sufficiently pleads a claim for intentional or negligent misrepresentation. As discussed below, Plaintiff shows there is a plausible claim for breach of agreement. Assuming there was an agreement between the parties, Plaintiff properly alleges that Defendants made false representations so that Plaintiff would be induced to enter into an agreement with Defendants. Plaintiff asserts that Fortress had every reason to believe in Guthrie Jr.'s representations. ECF No. 74 at ¶ 29. Plaintiff then may have had a right to rely on the representations or its reliance was reasonable because it believed Guthrie Jr. knew and understood Fortress's security systems and customers' requirements, and that AlarmSIM had the ability to provide a high level of customer support through its call center. *Id.* Assuming that a business relationship existed and a valid agreement occurred, Plaintiff pleads sufficient facts to state a claim for intentional and/or negligent misrepresentation based merely on the facts found in the Second Amended Complaint. Plaintiff overcomes the low bar of a motion to dismiss and the issues are better addressed in a motion for summary judgment or at trial when other facts concerning the parties' alleged agreement may be considered.

**7. Breach of Agreement**

Plaintiff alleges Defendants breached an agreement with Fortress to provide Fortress's customers state of the art and properly functioning products, and prompt,

courteous, and effective customer service in consideration for Fortress recommending AlarmSIM SIM cards to its customers. *Id.* at ¶¶ 112-16. A claim for breach of contract is actionable under Washington law "if the contract imposes a duty, the duty is breached, and the breach proximately causes damage to the claimant." *Nw. Indep. Forest Mfrs. v. Dep't of Labor & Indus.*, 78 Wash. App. 707, 712 (1995) (citation omitted). As an initial matter, a valid contract or agreement must exist.

Defendants contend that Plaintiff proffers a single unsolicited telephone call on November 11, 2013 between Guthrie Jr. and Hofeditz as proof of this agreement. ECF No. 75 at 22. Defendants argue that under the Washington statute of frauds, contracts that are not to be performed within one year of their making must be reduced to writing to be valid. ECF No. 75 at 22; RCW 19.36.010(1). Plaintiff alleges that the agreement was in effect from 2014 through 2016, and Defendants then argue that the agreement is void for failure to conform to the statute of frauds. ECF No. 75 at 23. Plaintiff contends this rule does not mean that a contract needs to be completed within the year, only that it can be completed within a single year. ECF No. 79 at 23. Plaintiff states that the agreement did not have a definite term and could have been terminated by either party within the first year and thereby completed. *Id.*

1          Washington's statute of frauds requires that an agreement, "not to be

2   performed one year from the making thereof," is void unless in writing and signed

3   by the party to be charged.  RCW 19.36.010.  The Washington Supreme Court

4   adheres to the general rule:

5              that the fact that either of the parties may have an option to put an end
            to a contract within a year does not take it out of the operation of the
6          statute if, independent of the exercise of such power, the agreement
            cannot be performed within a year …. [I]f no definite time for the
7          duration of the contract is fixed and it may be terminated at will or by
            a certain notice, which will permit of its termination within a year, it
8          is not within the statute.

9   *French v. Sabey Corp.*, 134 Wash. 2d 547, 553 (1998) (quotation and citation

10  omitted).  Here, if a valid contract or agreement existed, it is likely that the parties

11  would be able to terminate the agreement at any time in the first year.  The Court

12  then finds that the statute of frauds will likely not bar Plaintiff's claim for breach of

13  agreement and considers the merits of Defendants' argument.

14         Defendants assert that the terms of the contract are undefined and

15  unenforceable, listing various questions that are unanswered in the alleged

16  agreement.  ECF No. 75 at 23.  Defendant then contends that the parties never

17  came to a "meeting of the minds" and no agreement ever existed.  *Id.* at 24.

18  Plaintiff responds that the agreement clearly contemplates that both sides would

19  make commercially reasonable efforts to keep their promises.  ECF No. 79 at 22.

20  Plaintiff states that it used reasonable efforts to advertise and promote Defendants'

SIM card, but Defendants did not keep their promise to supply suitable SIM cards or customer service to Fortress's customers. *Id.*

In merely considering the facts in the Second Amended Complaint, the Court finds that there is evidence of an agreement between the parties. Hofeditz thought a valid agreement existed with Defendants after the telephone conversation on November 11, 2013. ECF No. 74 at ¶¶ 28-30. According to the facts alleged by Plaintiff, the parties agreed that AlarmSIM would supply "state of the art" SIM cards and "top notch" customer service in return for Fortress's promise to recommend the AlarmSIM SIM card to its customers. *Id.* Fortress then referred its customers, but AlarmSIM did not supply "state of the art" SIM cards or "top notch" service. *Id.* at ¶¶ 32-33. Looking at these alleged facts, the agreement imposed a duty, AlarmSIM breached that duty, and the breach proximately caused Plaintiff's alleged damages.

While the Court is aware of other facts that were not plead in the Second Amended Complaint, the Court is limited to considering only this telephone call as evidence of an agreement. In considering these facts in the light most favorable to Plaintiff, the Court finds that Plaintiff sufficiently pleads a plausible claim for breach of agreement. The ultimate issue is then better determined at summary judgment or trial when all of the facts may be considered.

//

### 8. Violation of RCW 19.86 *et seq.*

Plaintiff asserts that Defendants' conduct constitutes unfair and deceptive business practices under the Washington Consumer Protection Act, RCW 19.86 *et seq. Id.* at ¶ 118. The CPA prohibits unfair competition and deceptive or unfair business practices in the conduct of any trade or commerce. RCW 19.86.020.

Defendants argue that Plaintiff fails to state a claim for false designation of origin, unfair competition, false advertising, and negligent or intentional misrepresentation. ECF Nos. 75 at 24; 81 at 8. Defendants then assert that Plaintiff's action for violation of the CPA, which simply incorporates those causes of action, cannot stand. ECF Nos. 75 at 24; 81 at 8. Defendants insist that the mere formulaic recitation of the elements of the CPA without sufficient facts to support the allegation of unfair competition cannot defeat a motion to dismiss. ECF No. 75 at 24. Plaintiff responds that in violating the statutes and common law principles discussed above, Defendants have engaged in unfair competition and unfair and deceptive conduct in violation of the CPA. ECF No. 79 at 24.

As the Court found above that Plaintiff states a plausible claim for unfair competition and deceptive or unfair business practices, the Court also determines that Plaintiff sufficiently pleads a claim for violation of RCW 19.86 *et seq.*

### 9. Alter Ego

When subject matter jurisdiction is based on a federal question arising under

the Lanham Act, 15 U.S.C. § 1051 *et seq.*, federal common law controls as to whether to pierce the corporate veil. *OTR Wheel Eng'g. Inc. v. W. Worldwide Servs., Inc.*, No. 2:14-CV-00085-LRS, 2014 WL 11514767, at *1 (E.D. Wash. Aug. 1, 2014). "[A]lter ego is a procedural mechanism to enforce an underlying claim and not an independent cause of action." *Five Points Hotel P'ship v. Pinsonneault*, 697 F. App'x 549, 550 (9th Cir. 2017) (citation omitted). "A claim based on the alter ego theory is not in itself a claim for substantive relief, but rather is procedural." *Id.* at 550 (quoting 1 Fletcher Cyclopedia of the Law of Private Corporations § 41.10 (Sept. 2016 update)). "A finding of fact of alter ego, standing alone, creates no cause of action. It merely furnishes a means for a complainant to reach a second corporation or individual upon a cause of action that otherwise would have existed only against the first corporation." 1 Fletcher Cyclopedia of the Law of Private Corporations § 41.10 (Sept. 2017 update). Alter ego or veil piercing is then "a means of imposing liability on an underlying cause of action such as a tort or breach of contract." *Id.*

Here, Defendants emphasize that this Court previously determined that alter ego/veil piercing is not a separate cause of action, but is based on the other causes of action. Defendants then argue that Plaintiff's alter ego claim should be dismissed. ECF Nos. 75 at 25; 81 at 8.

As the Court previously determined, Plaintiff's alter ego theory is not a

separate claim and should not be considered in a motion to dismiss. Plaintiff's assertion of alter ego is merely meant to hold Guthrie Jr. liable alongside AlarmSIM and the theory is not a separate cause of action. The Court dismisses the alter ego theory as a separate cause of action without leave to amend, but the theory remains as a means to hold Guthrie Jr. liable.

**ACCORDINGLY, IT IS HEREBY ORDERED:**

1. Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint for Failure to State a Claim (ECF No. 75) is **GRANTED in part** and **DENIED** in part. Defendants' motion is **GRANTED** in regards to Plaintiff's alter ego claim as a separate cause of action. Defendants' motion is **DENIED** in regards to Plaintiff's remaining claims.

2. Plaintiff's Assented-To Motion for Leave to File Four Page Sur-Reply (ECF No. 83) is **GRANTED**.

3. Plaintiff's Motion for Leave to File Amended Opposition, etc. (ECF No. 85) is **DENIED** as moot.

The District Court Executive is directed to enter this Order and furnish copies to counsel.

**DATED** July 30, 2018.



THOMAS O. RICE
Chief United States District Judge

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTION TO DISMISS ~ 42