UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| FORTRESS SECURE SOLUTIONS LLC, a Washington limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>ALARMSIM LLC, a North Carolina limited liability company, and RICKIE GUTHRIE, JR., an individual,<br><br>Defendants. | NO. 4:17-CV-5058-TOR<br><br>ORDER ON MOTIONS FOR SUMMARY JUDGMENT AND EXCLUSION OF TESTIMONY |

BEFORE THE COURT are Plaintiff's Motion for Partial Summary Judgment (ECF No. 108), Defendants' Motion for Summary Judgment (ECF No. 113), Plaintiff's Motion to Strike Expert Opinion of Scott Hampton (ECF No. 102), Plaintiff's Motion to Strike Expert Opinion of Nicholas Carroll (ECF No. 104), and Defendants' Motion to Strike Expert Opinion of Hiren Modi (ECF No. 116). These matters were submitted for consideration without oral argument. The

Court has reviewed the record and files herein, and is fully informed.[1]  For the reasons discussed below, Plaintiff's Motion for Partial Summary Judgment is denied, Defendants' Motion for Summary Judgment is granted in part and denied in part, Plaintiff's Motion to Strike Expert Opinion of Scott Hampton is denied, Plaintiff's Motion to Strike Expert Opinion of Nicholas Carroll is granted in part and denied in part, and Defendants' Motion to Strike Expert Opinion of Hiren Modi is granted in part and denied in part.

## BACKGROUND

This case arises from the business relationship between Plaintiff, a company that makes and supports home security systems, and Defendants, a company and its primary operator that during the relevant time period made SIM cards that were

---

[1]  Defendants' response memoranda to Plaintiff's motions to strike Defendants' experts (ECF Nos. 123, 124), Defendants' reply memorandum regarding Defendants' Motion to Strike Expert Testimony of Hiren Modi (ECF No. 131), and Plaintiff's reply memoranda regarding Defendants' motions to strike Plaintiff's experts (ECF Nos. 133, 134) were all untimely filed.  The Court instructs all counsel in this matter to review Local Civil Rule 7, which distinguishes between and governs the filing deadlines for dispositive and nondispositive motions.

used in Plaintiff's security systems. The following facts are not in dispute. For purposes of summary judgment, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may … consider the fact undisputed." Fed. R. Civ. P. 56(e)(2).

**A. The Parties**

Plaintiff Fortress Secure Solutions ("Fortress") is a retail home security alarm business. ECF No. 114 at 2, ¶ 1. Michael Hofeditz is the president of Fortress. *Id.* at ¶ 2. Fortress's alarm systems operate using a global system for mobile communications ("GSM"), which requires the use of a SIM card to communicate when an alarm has been triggered. *Id.* at ¶ 3. Fortress sells the hardware for the alarm system along with a three-year warranty and lifetime support for its product. *Id.* at ¶ 6. During the relevant period in this case, Fortress did not sell the SIM cards that were used in their security systems. *Id.* at ¶ 4. The SIM cards were available from network providers AT&T and T-Mobile. ECF No. 114 at 3, ¶ 9.

Defendant AlarmSIM, LLC ("AlarmSIM") was a retail business which marketed and sold SIM cards for use in home security systems. ECF No. 114 at 3, ¶ 11. Defendant Ricky Guthrie, Jr. was the primary operator of AlarmSIM. *Id.* at ¶ 13. In November 2013, Mr. Guthrie contacted Mr. Hofeditz to propose a

partnership in which Fortress would sell AlarmSIM SIM cards.  *Id.* at ¶ 14.  Mr. Hofeditz rejected this proposal.  *Id.* at ¶ 15.  Later, Mr. Hofeditz and Mr. Guthrie had a verbal conversation in which Mr. Hofeditz asked Mr. Guthrie, "Can you provide SIM cards to my customers and provide the necessary support?"  ECF No. 114 at 4, ¶ 17.  Based on this conversation, Fortress began recommending AlarmSIM to its customers for SIM cards.  *Id.* at ¶ 20.  By October and November of 2015, Fortress was actively referring its customers to AlarmSIM.  ECF No. 114 at 5, ¶ 28.  AlarmSIM's SIM cards used, at the customer's option, either AT&T or T-Mobile 2G or 3G networks.  ECF No. 109 at 5, ¶ 20.

**B.  The Cellular Network Transition**

In 2015, AT&T and T-Mobile were the primary 2G network providers in the United States.  ECF No. 109 at 5, ¶ 21.  As technology developed in favor of the 3G network, AT&T announced that its 2G network was projected to terminate on January 1, 2017.  *Id.* at ¶ 26.  T-Mobile's 2G network was not projected to terminate in 2016 and is still functioning today.  ECF No. 109 at 6, ¶ 27.

In October 2015, Fortress announced and made available for sale its Fortress Total Security System ("TSS"), which would utilize the 3G network.  ECF No. 109 at 8, ¶¶ 44-45.  Existing Fortress customers could purchase the new TSS system or upgrade their existing basic system, at Fortress's cost, to make their security system compatible with 3G technology.  *Id.* at ¶ 47.

In 2015, AlarmSIM contacted Eric Vicini to design software to permit a tablet to function as a home security system using the 3G network.  ECF No. 109 at 7, ¶ 36.  AlarmSIM's new security system was named the Remote Home Controller 1000 ("RHC 1000").  ECF No. 109 at 7, ¶ 38.  The RHC 1000 was advertised on the website www.remotehomecontroller.com ("RHC website").  ECF No. 109 at 7, ¶ 39.  Mr. Guthrie estimated that presales of the RHC 1000 numbered about 20.  ECF No. 114 at 7, ¶ 40.  Mr. Vicini never finished the software, so AlarmSIM never had a completed tablet security system.  ECF No. 114 at 7, ¶ 39.

**C.  The AlarmSIM Email**

On December 14, 2015, AlarmSIM sent the following email to its customer base (the "allegedly defamatory email"):

Subject: Important 2G Sunset Update for Your Security System

Is Your Security Panel on the 3G Network?  If It Doesn't Say So Specifically, It Isn't.

Dear Customer:

This is an important update about your security system.

Many of you have contacted us with concerns about your 2G based security system.

Some of you have already lost access to the SMS alerts.

The reason is because, as the 2G network is being phased out, the carriers are moving their capacities into the 3G network.  In some markets, access is no longer available.  In others, it is diminished.  This is in preparation of the final sunset of the network in 2016.

THIS IS A SERIOUS RISK TO THE PROPER FUNCTIONING OF YOUR SECURITY SYSTEM.

The existing companies have been either slow or absent in their response.

AlarmSIM has decided to introduce its own, new 3G security panel.

In order to save you trouble and money, this panel is designed to work with most existing wireless sensors, [sic] Furthermore, this panel will also allow control of camera, smart home and other advanced sensors.

We are extending a special invitation for AlarmSIM customers to pre-purchase this revolutionary alarm panel. Based on the latest Android OS, it will get regular, automatic updates, has 2 SIM slots for added security.

This panel is to what is currently on the market what a computer is to a calculator.

THIS DISCOUNTED OFFER IS LIMITED TO THE FIRST 200 ORDERS.

CLICK HERE TO ORDER

Thank you for your continued support and, as always, Stay Safe!

Sincerely,

The AlarmSIM Team

ECF No. 109 at 2, ¶ 1.

When a customer clicked on "CLICK HERE TO ORDER" in the email, the customer was redirected to a "Special Invitation" page on the website www.remotehomecontroller.com (the "RHC website"). ECF No. 109 at 2, ¶ 2. The "Special Invitation" page included the following language:

Introducing the RHC 1000! This new and revolutionary, state-of-the-art, home control panel is designed to replace your existing 2G home security panel. If you have a "Fortress", "PiSector" or "Kerui" system, you may be particularly at risk to lose coverage due to the sunset of the 2G network. Even if you bought a system labled [sic] as 3G or 4G, this may not be the case. Don't assume your system is 3G/4G.

ECF No. 109 at 2-3, ¶ 2.

**D. Response to the AlarmSIM Email**

Following AlarmSIM's email, Fortress's customers began to contact Fortress with concerns about the issues raised in AlarmSIM's email.[2] ECF No. 109 at 9, ¶ 48. Mr. Hofeditz visited the RHC website and used its Live Chat feature to chat with a party identified as "Eric." ECF No. 114 at 9, ¶ 57; ECF No. 135-1 at 24, ¶ 57. Eric stated that he did not work for AlarmSIM and that his company was not affiliated with Fortress, but Eric stated that the RHC 1000 was designed to replace Fortress systems. ECF No. 114 at 9, ¶¶ 58-60.

Within days of the allegedly defamatory email being sent, Fortress employed the e-commerce solutions and internet marketing company Commerce Pundit to design and implement a digital marketing campaign. ECF No. 109 at 10, ¶ 55.

---

[2] The parties dispute the quantity and nature of this customer response, but it is undisputed that some customers contacted Fortress regarding the allegedly defamatory email. ECF No. 130 at 12, ¶ 48.

This campaign included aggressive pay per click advertising on Google, Amazon, and other channels. *Id.* In late December 2015, Fortress sent a cease and desist letter to AlarmSIM regarding the allegedly defamatory email requesting, among other relief, a list of AlarmSIM's customers who had been contacted about the panel. ECF No. 109 at 9-10, ¶ 52. AlarmSIM did not provide Fortress with a list of customers who received the allegedly defamatory email. ECF No. 109 at 10, ¶ 54.

## DISCUSSION

### A. *Daubert* Motions

Plaintiff moves to strike the opinions of Defendants' experts Scott Hampton and Nicholas Carroll. ECF Nos. 102, 104. Defendants move to strike the opinions of Plaintiff's expert Hiren Modi. ECF No. 116.

The admission of expert witness testimony is governed by Federal Rule of Civil Procedure 702. Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

In *Daubert v. Merrell Dow Pharm., Inc.*, the Supreme Court explained that trial courts must perform a "gatekeeping" function to ensure that expert testimony conforms to Rule 702's relevance and reliability requirements. 509 U.S. 579, 597 (1993). *Daubert* identifies four non-exclusive factors a court may consider in assessing the relevance and reliability of expert testimony: (1) whether a theory or technique has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential error rate and the existence and maintenance of standards controlling the theory or technique's operation; and (4) the extent to which a known technique or theory has gained general acceptance within a relevant scientific community. *Id.* at 593-94. These factors are not to be applied as a "definitive checklist or test," but rather as guideposts which "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999). The ultimate objective is to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152.

"The determination whether an expert witness has sufficient qualifications to testify is a matter within the district court's discretion." *United States v. Garcia*, 7

F.3d 885, 889 (9th Cir. 1993) (citation omitted).  "Rule 702 contemplates a broad conception of expert qualifications."  *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1015 (9th Cir. 2004) (internal quotation marks and citation omitted) ("[T]he advisory committee notes emphasize that Rule 702 is broadly phrased and intended to embrace more than a narrow definition of qualified expert." (citation omitted)).  Where a witness has considerable experience working in a specific field, the witness's "lack of particularized expertise" in one aspect of that field, "goes to the weight accorded her testimony, not to the admissibility of her opinion as an expert."  *Garcia*, 7 F.3d at 889-90.  In such situations, "[v]igorous cross-examination, presentation of contrary evidence, and careful [application of] the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  *See Daubert*, 509 U.S. at 596.

The determination of whether the offered testimony will assist the Court requires the Court to evaluate its relevance and reliability.  *See Daubert*, 509 U.S. at 591-92, 597.  Evidence is relevant if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."  Fed. R. Evid. 401.  The reliability of expert testimony is evaluated in regard to the expert's "basis in the knowledge and experience of his discipline."  *Kumho Tire Co.*, 526 U.S. at 148 (1999) (quoting *Daubert*, 509 U.S. at 592).  This inquiry is "flexible," and reliability must be

evaluated "in light of the particular facts and circumstances of the particular case." *Id.* at 158; *see also Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014).

### 1. Scott Hampton

Defendants offer Mr. Hampton as an expert on monetary damages. *See* ECF No. 106-1 at 4. Plaintiff moves to preclude Mr. Hampton from offering an expert opinion "on the efficacy or projected costs of certain suggested corrective advertising measures" and to strike those opinions from Mr. Hampton's expert report. ECF No. 102 at 1-2.

Mr. Hampton is a Certified Public Accountant licensed in California, Washington, and Utah. ECF No. 106-1 at 5. He has a Bachelor of Science degree in accounting, has over 30 years of experience in accounting, and has offered expert economic opinions in over 100 cases. *Id.* at 5-6. He was retained to render an opinion on the monetary damages in this case. *Id.* at 4. Plaintiff argues Mr. Hampton should be precluded from offering the four following "challenged opinions": (1) the efficacy of a two-email campaign to correct representations in the alleged defamatory email; (2) the efficacy of a single letter campaign to correct the same representations; (3) the cost of the hypothetical two-email campaign; and (4) the cost of the hypothetical single letter campaign. ECF No. 102 at 5-6.

Plaintiff seeks to exclude the first two challenged opinions, regarding the efficacy of two options for corrective campaigns to address the alleged defamatory email, as outside of Mr. Hampton's scope of expertise. ECF No. 102 at 6-7. Mr. Hampton admitted in his deposition that he is not an advertising expert, and his educational and work experience do not indicate he has special experience with advertising. ECF No. 106-2 at 11; ECF No. 106-1 at 4-6. However, Plaintiff's motion seeks to exclude opinions that Mr. Hampton has not rendered. Mr. Hampton specifically stated in his deposition that he offered opinions on the cost of the various corrective campaigns, not opinions as to their efficacy. ECF No. 106-2 at 11. Mr. Hampton's written expert report similarly does not opine on the relative efficacy of a particular corrective advertising campaign. ECF No. 106-1 at 8. To the extent Plaintiff seeks to preclude Mr. Hampton from offering opinions that Mr. Hampton does not actually intend to offer, Plaintiff's motion is denied.

Plaintiff also seeks to preclude Mr. Hampton's opinions about the cost of the various corrective campaigns on the ground that these calculations did not require "specialized knowledge." ECF No. 102 at 7-8. Although Mr. Hampton's specific calculations may not be complicated, they are based on the factual evidence presented in this case and methods Mr. Hampton has developed through his expertise in the field of accounting. Fed. R. Evid. 702. Plaintiff can challenge the substance of Mr. Hampton's calculations on cross-examination. *See Alaska Rent-*

*A-Car, Inc. v. Avis Budget Group, Inc.*, 738 F.3d 960, 969 (9th Cir. 2013) ("[T]he judge is supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable.")  Mr. Hampton's opinions on the cost of relative corrective marketing campaigns are the proper subject of expert testimony, and Plaintiff's motion to prohibit Mr. Hampton from testifying on this subject is denied.

### 2.  Nicholas Carroll

Defendants offer Mr. Carroll as an expert in defamation and advertising. ECF No. 98 at 3.  Plaintiff moves to preclude Mr. Carroll from offering any opinions at trial and to strike Mr. Carroll's expert report.  ECF No. 104 at 1.

As a threshold matter, the parties dispute the scope of Mr. Carroll's expertise.  Plaintiff characterizes Mr. Carroll's report and anticipated testimony as offering opinions on the "operation, benefits, coverage, or functionality of the 2G or 3G cellular networks."  ECF No. 104 at 7.  In contrast, Defendants characterize Mr. Carroll as "an expert on truth in advertising and defamation."  ECF No. 123 at 2.  A review of Mr. Carroll's expert report shows Mr. Carroll offers opinions on both subjects.  While some of Mr. Carroll's opinions conclude that certain language in the allegedly defamatory email constitutes generally acceptable advertising practices, Mr. Carroll also bases these conclusions on opinions he has formed regarding the transition from the 2G cellular network to the 3G cellular

network.  ECF No. 107-1 at 6-8.  Accordingly, the Court considers Mr. Carroll's qualifications to opine on each subject.

   *a.  Cellular Network Technology*

   Regarding Mr. Carroll's expertise on the subject of cellular networks, the Court agrees with Plaintiff that Mr. Carroll is not sufficiently qualified to offer expert opinion evidence on the 2G-to-3G transition.  While Mr. Carroll has some experience with digital technology, "there are limits to an expert's ability to testify about customary practice.  For example, a proffered travel industry expert may not be in the position to testify about the customs of the cruise line business specifically if he or she has never worked in the cruise industry." *Mullins v. Premier Nutrition Corp.*, 178 F. Supp. 3d 867, 900 (N.D. Cal. 2016) (citing *Samuels v. Holland Am. Line-USA Inc.*, 656 F.3d 948, 953 (9th Cir. 2011)).  Here, although Mr. Carroll has a Bachelor of Science degree in Technology Management, he does not appear to have any special training or work experience specific to 2G or 3G cellular network functionality.  ECF No. 107-1 at 4-5, 12-15. In his deposition, Mr. Carroll testified to what he characterized as industry perception of "mixed messages" during the 2G-to-3G transition and other characterizations he asserted were "common knowledge" in the industry at the time. *See, e.g.*, ECF No. 107-2 at 4, 6, 8.  However, when questioned during his deposition about the sources of his knowledge of industry understanding, Mr.

Carroll could not identify specific facts or sources to support his characterizations, aside from one conversation with an IT systems administrator. ECF No. 107-2 at 11-12. Mr. Carroll also testified that he reviewed articles from *PC Magazine* in preparation for his report, and his report cites to an AT&T official announcement, two articles from *PC Magazine*, and Wikipedia as sources for the technical basis for Mr. Carroll's report. ECF No. 107-1 at 7; ECF No. 107-2 at 12. These sources and single conversation fall below the threshold of "intellectual rigor" necessary to support expert testimony on the subject of cellular network functionality. *Kumho Tire Co.*, 526 U.S. at 152. Although Defendants characterize Mr. Carroll's report as only offering opinions on defamation and advertising, the face of Mr. Carroll's report makes clear that his conclusions are based upon his opinions about cellular network functionality and industry common knowledge of the same. Mr. Carroll is not sufficiently qualified to give an expert opinion on these subjects, so he will not be permitted to offer an expert opinion on cellular network functionality or characterize industry knowledge of cellular networks. These provisions of Mr. Carroll's expert report shall similarly be stricken.

Additionally, Mr. Carroll's chart depicting the 2G SIM Card market shall be stricken for the reasons described *supra*, as well as for being unduly confusing and misleading. ECF No. 107-1 at 8. This exhibit purports to demonstrate that the life expectancy of the 2G network was short as of December 2015; however, the chart

itself documents the relative market share of the 2G network between AT&T and T-Mobile, which is a distinct concept from the market's overall longevity. Moreover, the chart is mathematically inaccurate. While the chart shows that only two entities occupied the 2G market in 2010, with AT&T at 70% of the relative market share and T-Mobile at 30% of the relative market share, these proportions do not remain accurate as the chart shows the passage of time. After the chart documents AT&T shuttering its 2G network in 2017, it continues to show T-Mobile as holding 30% or less of the relative market share, despite being the only entity in the 2G market (thus holding 100% of the relative market share). Because this chart is not mathematically accurate, its risk of confusing or misleading the jury outweighs its probative value. Fed. R. Evid. 403. Accordingly, Mr. Carroll's chart shall be stricken from his expert report.

### b. Defamation and Advertising

Defendants assert Mr. Carroll should be permitted to offer expert opinion evidence on the subjects of defamation and advertising, and that Mr. Carroll should be permitted to opine that statements in the allegedly defamatory email do not rise to the level of defamation. ECF No. 123 at 2, 4. Mr. Carroll has over 30 years of experience as a professional editor performing libel reviews and has nearly 30 years of experience in the advertising industry. ECF No. 107-1 at 4-5. Much of his experience in editing and libel review and some of his experience in advertising

has been specific to high-tech industries.  *Id.*  Accordingly, Mr. Carroll is sufficiently qualified to give an opinion on defamation and advertising.

However, Mr. Carroll's ability to offer expert opinion testimony is not without limits.  "It is well-established … that expert testimony concerning an ultimate issue is not per se improper."  *Elsayed Mukhtar v. California State Univ., Hayward*, 299 F.3d 1053, 1066 (9th Cir. 2002), *overruled on other grounds by Barabin*, 740 F.3d at 467.  "That said, 'an expert witness cannot give an opinion as to her *legal conclusion*, i.e., an opinion on the ultimate issue of law.'"  *Hangarter*, 373 F.3d at 1016 (quoting *Mukhtar*, 299 F.3d at 1066 n.10) (emphasis in original).  Mr. Carroll may properly testify to common practices in the advertising industry and whether and how certain statements in the allegedly defamatory email conform to certain industry practices.  However, Mr. Carroll may not offer conclusions that specific statements in the allegedly defamatory email are or are not defamatory.  These opinions are legal conclusions and are therefore not the appropriate subject of expert testimony.  Statements in Mr. Carroll's report that conclude that certain portions of the allegedly defamatory email are not or cannot be defamation shall be stricken from Mr. Carroll's expert report.  In sum, Plaintiff's motion to strike Mr. Carroll's expert report is granted in part and denied in part.

### 3. Hiren Modi

Plaintiff offers Mr. Modi as a fact witness regarding Plaintiff's corrective advertising campaign following the alleged defamatory email. ECF No. 119 at 2. Plaintiff also disclosed a document captioned "Declaration and Report of Hiren Modi," pursuant to Fed. R. Civ. P. 26(a)(2)(B), which indicates Mr. Modi was "asked to opine as to the reasonableness of this campaign in relation to the projected negative impact of Defendants' misrepresentations." ECF No. 116-1 at 4. Defendants move to strike Mr. Modi's expert report and to prohibit him from testifying as an expert witness on several grounds: that Mr. Modi does not qualify as an expert, that Mr. Modi is a biased witness, that Mr. Modi's expert report is deficient under Rule 26, that Mr. Modi's report contains improper legal conclusions, and that Mr. Modi did not draft his own report. ECF No. 116 at 3-12. Plaintiff responds that Defendants' motion is a pretext to exclude factual evidence. ECF No. 119 at 2.

The Federal Rules of Evidence allow for opinion testimony from both lay and expert witnesses. Fed. R. Evid. 701, 702. "[T]he distinction between lay and expert witness testimony is that lay testimony 'results from a process of reasoning familiar in everyday life,' while expert testimony 'results from a process of reasoning which can be mastered only by specialists in the field.'" Fed. R. Evid. 701 (quoting *State v. Brown*, 836 S.W.2d 530, 549 (Tenn. 1992)). "It is necessary

that a lay witness's 'opinions are based upon … direct perception of the event, are not speculative, and are helpful to the determination' of factual issues before the jury." *United States v. Freeman*, 498 F.3d 893, 905 (9th Cir. 2007) (quoting *United States v. De Peri*, 778 F.2d 963, 977 (3d Cir. 1985)).

Although Plaintiff contends Mr. Modi is largely a fact witness, Plaintiff submitted Mr. Modi's declaration styled as a Rule 26 expert disclosure. ECF No. 116-1. Mr. Modi's declaration and the excerpts of his deposition provided to the Court are indeed largely factual, with the exception of Mr. Modi's opinion that the specific corrective advertising campaign undertaken by Plaintiff was a reasonable response to the alleged defamatory email. *See* ECF No. 120-2 at 11. The issue becomes whether this opinion constitutes a lay opinion or an expert opinion. In his expert report and his deposition testimony, Mr. Modi does not indicate that he formed his opinion that the corrective advertising campaign was reasonable and necessary through "a process of reasoning which can be mastered only by specialists in the field" of advertising. Fed. R. Evid. 701. Although Mr. Modi may have an educational background and work experience in e-commerce and digital marketing, Mr. Modi's declaration and deposition testimony do not detail how he applied any specialized knowledge he has to form his opinion. Instead, Mr. Modi describes being informed of the contents of the alleged defamatory email and working with Plaintiff to develop and place advertisements without any reference

to specialized concepts within the advertising field.  While Plaintiff emphasizes that Mr. Modi has experience and education in the subject on which he offers an opinion, this is only one component of the analysis the Court engages in before qualifying an expert.  Fed. R. Civ. P. 702.

The question that Mr. Modi's opinion addresses is whether the scope of the corrective advertising campaign was proportional to the amount of harm caused by the alleged defamatory email.  This is not the type of specialized inquiry that calls for expert testimony.  Mr. Modi can describe his understanding of the alleged defamatory email and how, in his capacity as the owner of an e-commerce business, he helped Plaintiff create a responsive advertising campaign.  Mr. Modi's opinion about the reasonableness of that campaign is based on his first-hand experience working with Plaintiff, would be helpful to the jury in understanding the damages in this case, and is not on any technical or specialized information.  Fed. R. Evid. 701.  Accordingly, Mr. Modi may testify to the facts of this case and his opinion thereof as a lay witness, not as an expert witness.  Defendants' other concerns about bias may be addressed on cross-examination, but they do not provide grounds to completely exclude Mr. Modi's testimony.  Because Mr. Modi does not qualify as an expert witness, his declaration is struck as an expert report, and the Court declines to address Defendants' other arguments surrounding the

drafting of the declaration.[3]  Defendants' motion to strike Mr. Modi's expert report

is granted, and Defendants' motion to completely exclude Mr. Modi's testimony is

denied.

## B.  Summary Judgment

Plaintiff moves for partial summary judgment on Plaintiff's unfair

competition, false advertising and defamation claims.  ECF No. 108.  Defendants

move for summary judgment on all of Plaintiff's pending claims.  ECF No. 113.

The Court may grant summary judgment in favor of a moving party who

demonstrates "that there is no genuine dispute as to any material fact and that the

movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In ruling

on a motion for summary judgment, the court must only consider admissible

evidence.  *Orr v. Bank of America, NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002).

The party moving for summary judgment bears the initial burden of showing the

absence of any genuine issues of material fact.  *Celotex Corp. v. Catrett*, 477 U.S.

---

[3]      This includes Plaintiff's argument for sanctions for Defendants' alleged

spoliation, which is only raised as a response to Defendants' argument that Mr.

Modi's expert report should be stricken for incompleteness.  ECF No. 119 at 10.  If

Plaintiff wishes to actually move for sanctions, Plaintiff may do so in the form of a

motion.

317, 323 (1986). The burden then shifts to the non-moving party to identify specific facts showing there is a genuine issue of material fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id*. at 252.

For purposes of summary judgment, a fact is "material" if it might affect the outcome of the suit under the governing law. *Anderson*, 477 U.S. at 248. Further, a material fact is "genuine" only where the evidence is such that a reasonable jury could find in favor of the non-moving party. *Id.* The Court views the facts, and all rational inferences therefrom, in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). Summary judgment will thus be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

*1. Claims Two and Three: Lanham Act and Common Law Unfair Competition*

Defendants move for summary judgment on Plaintiff's claims under the Lanham Act and for common law unfair competition. ECF No. 113 at 5-15. Plaintiff also moves for partial summary judgment on the Lanham Act claim. ECF No. 108 at 7-10.

The elements of a Lanham Act § 43(a) false advertising claim are:

(1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a lessening of the goodwill associated with its products.

*Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997). A plaintiff must show that "the statement was literally false, either on its face or by necessary implication, or that the statement was literally true but likely to mislead or confuse consumers." *Id.* (citation omitted). The elements of false advertising under the Lanham Act are identical to the elements of unfair competition under Washington common law. *Cascade Yarns, Inc. v. Knitting Fever, Inc.*, No. C10-861 RSM, 2015 WL 3407882, at *7 (W.D. Wash. May 27, 2015).

      *a. Defendants' Motion for Summary Judgment*

Defendants move for summary judgment based on the argument that no statements in the allegedly defamatory email, on the RHC website, or Mr. Hofeditz's live chat with Eric contain false information. ECF No. 113 at 7-14. "In analyzing whether an advertisement … is literally false, a court must determine, first, the unambiguous claims made by the advertisement …, and second, whether those claims are false." *In-N-Out Burgers v. Smashburger IP Holder LLC*, No. SACV 17-1747 JVS (DFMx), 2019 WL 1431904, at *4 (C.D. Cal. Feb. 6, 2019)

(quoting *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms, Co.*, 290 F.3d 578, 586 (3d Cir. 2002)).  "When evaluating whether an advertising claim is literally false, the claim must always be analyzed in its full context."  *Southland Sod*, 108 F.3d at 1139.  "In the Ninth Circuit, literal falsity is a question of fact."  *Quidel Corp. v. Siemens Med. Sol. USA, Inc.*, No. 16-cv-3059-BAS-AGS, 2019 WL 5320390, at *5 (S.D. Cal. Oct. 21, 2019) (citing *Southland Sod*, 108 F.3d at 1144-45)).

Construing the evidence in the light most favorable to Plaintiff, genuine issues of material fact preclude summary judgment for Defendants on the false advertising claims.  A reasonable jury could conclude that statements in the allegedly defamatory email and on the RHC website are false.  For example, Defendants assert that statements in the allegedly defamatory email are not false because Fortress's products are not referenced by name.  ECF No. 113 at 8.  However, the "full context" of the email requires consideration of the facts that Fortress's products were referenced by name when consumers clicked the link within the allegedly defamatory email, and that a number of AlarmSIM's customers were referred to AlarmSIM directly by Fortress.  *See* ECF No. 109 at 2-3, ¶ 2; ECF No. 114 at 5, ¶¶ 27-28.  Within this context, a reasonable jury could conclude that warnings in the email about changing network technology posing a "serious risk to the proper functioning of your security system" were specifically

referencing Fortress systems and falsely implying that Fortress systems were incapable of adapting to the 3G network.

Additionally, a reasonable jury could also conclude that the statement on the RHC website that "[i]f you have a 'Fortress'… system, you may be particularly at risk to lose coverage due to the sunset of the 2G network" is false. This statement clearly identifies Fortress's products by name, and Fortress has produced evidence to show that it had created a 3G security panel as well as a program to upgrade older Fortress panels to 3G compatibility at no cost to the customer. ECF No. 109 at 8-9, ¶¶ 46-47. Because Fortress produced evidence to show it had taken steps to transition its older alarm systems onto the 3G network, a reasonable jury could conclude that this statement on the RHC website is false.

In yet another example of a question of fact in this case, a reasonable jury could conclude that the statement in the email that "[t]his is in preparation of the final sunset of the network in 2016" is false in light of the evidence presented that the 2G network as a whole was not predicted to sunset in 2016 and AT&T's network was not predicted to sunset its 2G network until January 1, 2017. ECF No. 109 at 5-6, ¶¶ 25-27. These outstanding issues of fact concerning the falsity of the relevant statements preclude summary judgment.

Defendants also argue that summary judgment is appropriate on these claims because Plaintiff has not offered sufficient evidence of consumer deception or

confusion. ECF No. 113 at 11-14. However, "deliberate falsity yields a presumption of consumer deception in cases of non-comparative advertising and a presumption of consumer deception and injury in cases of direct comparative advertising." *Nat'l Products, Inc. v. Gamber-Johnson LLC*, 699 F. Supp. 2d 1232, 1241 (W.D. Wash. 2010); *see also Johnson & Johnson-Merck Consumer Pharm. Co. v. Rhone-Poulenc Rorer Pharm. Inc.*, 19 F.3d 125, 129 (3d Cir. 1994) ("If a plaintiff proves a challenged claim is literally false, a court may grant relief without considering whether the buying public was misled."). When a genuine issue of fact exists as to whether an advertisement is literally false, "[a] domino effect occurs … [and a] presumption is created in the plaintiff's favor with respect to the remaining elements that are typically contested in Lanham Act false advertising cases, thereby precluding the grant of summary judgment in favor of the defendant." *FLIR Sys., Inc. v. Sierra Media, Inc.*, 903 F. Supp. 2d 1120, 1132 (D. Or. 2012). Because a genuine issue of material fact exists about the falsity of the advertisements in this case, it would be inappropriate to grant summary judgment on Defendants' deception argument, given the presumption of deception created in Plaintiff's favor.

    b.  *Plaintiff's Motion for Summary Judgment*

    Plaintiff moves for partial summary judgment on the falsity of the statements in the allegedly defamatory email. ECF No. 108 at 8-10. However, when the facts

are construed in the light most favorable to Defendants, similar issues of fact preclude Plaintiff's motion for summary judgment.

Plaintiff argues that the specific statements in the allegedly defamatory email that the 2G network would experience a "final sunset" in 2016, that AlarmSIM's customers reported experiencing problems with their 2G security systems, suggestions that Fortress customers were at risk, that Fortress was slow to respond to the issue, and that AlarmSIM had developed a 3G security panel are all literally false statements. ECF No. 108 at 8. However, a reasonable jury could conclude that the allegation of a "final sunset" in 2016 is consistent with the evidence that AT&T intended to shut down its 2G network on January 1, 2017. ECF No. 109 at ¶ 25. A reasonable jury could conclude that the statements about Fortress customers experiencing problems with their 2G systems was true in light of Mr. Guthrie's testimony that AlarmSIM received such complaints from Fortress customers. *See* ECF No. 112-4 at 6-7. A reasonable jury could conclude that the evidence that Fortress developed a 3G panel and offered a free 3G upgrade to existing customers is evidence that Fortress's 2G customers were at risk of losing service. ECF No. 109 at 8-9, ¶¶ 46-47. A reasonable jury could conclude that the statement alleging a slow response by other companies is a reflection of Mr. Guthrie's opinion formed from his interactions with Fortress and other companies and therefore not literally false. ECF No. 112-4 at 9-10. And finally, a reasonable

jury could conclude that "AlarmSIM has decided to introduce its own, new 3G security panel" is not false in light of evidence presented that AlarmSIM was developing a 3G security panel. ECF No. 114 at 6-7, ¶¶ 32-39. These outstanding issues of fact concerning the falsity of the challenged statements preclude summary judgment.

### 2. Claim Four: Defamation

Plaintiff and Defendants each move for summary judgment on Plaintiff's defamation claim. ECF No. 108 at 10-11; ECF No. 113 at 5-14. The elements a plaintiff must establish in a defamation case are "falsity, an unprivileged communication, fault, and damages." *Mohr v. Grant*, 153 Wash. 2d 812, 822 (2005). The same issues of fact regarding the falsity of the statements made discussed *supra* preclude summary judgment for either side. Construing the evidence in the light most favorable to each non-moving party, a reasonable jury could conclude that the statements at issue either are or are not false. Accordingly, neither party is entitled to summary judgment.

### 3. Claims Five and Six: Tortious Interference with Contractual Relationships and Business Expectancy

Defendants move for summary judgment on Plaintiff's two tortious interference claims. ECF No. 113 at 15-18. The elements of a tortious interference claim are: (1) the existence of a valid contractual relationship or

business expectancy; (2) that defendants had knowledge of that relationship; (3) an intentional interference inducing or causing a breach or termination of the relationship or expectancy; (4) that defendants interfered for an improper purpose or used improper means; and (5) resultant damages. *Newton Ins. Agency & Brokerage, Inc. v. Caledonian Ins. Grp., Inc.*, 114 Wash. App. 151, 157-58 (2002). A valid business expectancy "includes any prospective contractual or business relationship that would be of pecuniary value." *Id.* at 158. Intentional interference "denotes purposefully improper interference." *Birkenwald Distrib. Co. v. Heublein, Inc.*, 55 Wash. App. 1, 11 (1989) ("When one acts to promote lawful economic interests, bad motive is essential, and incidental interference will not suffice.") (citations omitted).

Defendants argue Plaintiff has failed to show the first element. ECF No. 113 at 16-17. In response, Plaintiff does not identify evidence of a contractual relationship, but argues that it has a valid business expectancy of ongoing business from its clients. ECF No. 125 at 17. "A business expectancy exists when there is a relationship between parties contemplating a contract." *Nat'l City Bank, N.A. v. Prime Lending, Inc.*, No. CV-10-034-EFS, 2010 WL 2854247, at *4 (E.D. Wash. July 19, 2010) (citing *Pac. Nw. Shooting Park Ass'n v. City of Sequim*, 158 Wash. 2d 342, 353 n.2 (2006)). "This requires only a reasonable expectancy that the contract will come to fruition, and not a completed contract." *Nat'l City Bank*,

2010 WL 2854247 at *4 (citing *Scymanski v. Dufault*, 80 Wash. 2d 77, 84-85 (1972)).  Plaintiff cites evidence that it provides its customers with a three-year warranty and ongoing lifetime technical support, which Plaintiff asserts builds trust with its customers such that Plaintiff can expect customers to return to purchase products in the future.  ECF No. 125 at 17.  This type of expectation is too indefinite to constitute a reasonable business expectancy.  Plaintiff may hope that its customers are loyal to its brand, but it has not offered facts to demonstrate that it has a "reasonable expectancy" that past customers will return to contract for future purchases.  *Nat'l City Bank*, 2010 WL 2854247 at *4.  Plaintiff similarly offers no facts and develops no argument to support a finding that it has valid existing contractual relationships with its customers.  ECF No. 125 at 17.  Even if the Court were to assume that Plaintiff's provision of warranty coverage and ongoing customer support was evidence of a contractual relationship with its customers, Plaintiff has offered no evidence that Defendants' actions caused a breach of that contract.  ECF No. 125 at 17; *see Newton Ins. Agency*, 114 Wash. App. at 157-58.  Because Plaintiff cannot show that it has a valid business expectancy or contract, Defendants are entitled to summary judgment on Plaintiff's tortious interference claims.

1    *4.   Claim Seven: Unjust Enrichment*

2          Defendants move for summary judgment on Plaintiff's unjust enrichment

3    claim.  ECF No. 113 at 18-19.  "Unjust enrichment is the method of recovery for

4    the value of the benefit retained absent any contractual relationship because

5    notions of fairness and justice require it."  *Young v. Young*, 165 Wash. 2d 477, 484

6    (2008).  The elements of an implied contract unjust enrichment claim are "(1) the

7    defendant receives a benefit, (2) the received benefit is at the plaintiff's expense,

8    and (3) the circumstances make it unjust of the defendant to retain the benefit

9    without payment."  *Id.*

10         Here, Plaintiff argues that Defendants were unjustly enriched by Plaintiff's

11   efforts of recommending AlarmSIM SIM cards to its customers "over a period of

12   years by phone, email, Live Chat, and reviews."  ECF No. 125 at 18.  As discussed

13   *infra*, it is unclear whether a contract existed between the parties in this case.

14   However, even construing the facts in the light most favorable to Plaintiff on this

15   claim and assuming that no contract existed, Plaintiff offers no facts to support a

16   finding that it would be unjust for Defendants to retain the benefit of Plaintiff's

17   recommendations.  It is undisputed that Plaintiff recommended AlarmSIM to its

18   customers.  ECF No. 114 at 4, ¶ 20.  It is also undisputed that recommending

19   AlarmSIM to its customers was beneficial to Plaintiff because Plaintiff had a

20   reliable source of SIM cards to recommend to its customers that would be

specifically compatible with Plaintiff's alarm systems, which Mr. Hofeditz testified was valuable to him, and Plaintiff did not have to worry about providing SIM cards for its systems. ECF No. 114 at 3-4, ¶¶ 16, 18. Even construing the facts in the light most favorable to Plaintiff, the circumstances do not make it unjust for Defendants to retain the value of Plaintiff's recommendations without payment because Plaintiff also derived a benefit from the parties' arrangement. Defendants are entitled to summary judgment on Plaintiff's unjust enrichment claim.

    *5. Claim Eight: Intentional and/or Negligent Misrepresentation*

        Defendants move for summary judgment on Plaintiff's intentional and/or negligent misrepresentation claim. ECF No. 113 at 19-22. To state a claim for fraud or intentional misrepresentation under Washington law, a plaintiff must plead the following elements: (1) representation of an existing fact; (2) materiality; (3) falsity; (4) the speaker's knowledge of its falsity; (5) intent of the speaker that it should be acted upon by the plaintiff; (6) the plaintiff's ignorance of its falsity; (7) the plaintiff's reliance on the truth of the representations; (8) the plaintiff's right to rely upon it; and (9) damages suffered by the plaintiff. *Stiley v. Block*, 130 Wash. 2d 486, 505 (1996).

        To make a claim for negligent misrepresentation, a plaintiff "must prove by clear, cogent, and convincing evidence that": (1) defendants supplied false information for the guidance of others in their business transactions; (2) defendants

knew or should have known that the information was supplied to guide the plaintiff in his business transactions; (3) defendants were negligent in obtaining or communicating the false information; (4) the plaintiff relied on the false information; (5) the plaintiff's reliance was reasonable; and (6) the false information proximately caused the plaintiff's damages. *Ross v. Kirner*, 162 Wash. 2d 493, 499 (2007).

"A 'false representation' as to a presently existing fact is a prerequisite to liability for both fraud and negligent misrepresentation." *Wessa v. Watermark Paddlesports, Inc.*, No. C06-5156 FDB, 2006 WL 1418906, at *2 (W.D. Wash. May 22, 2006) (citations omitted). "[A p]laintiff must set forth, as a part of the circumstances constituting fraud, an explanation as to why the disputed statement was untrue or misleading when made." *Id.* at *3. Additionally, a statement that cannot be proven false cannot support a negligent misrepresentation claim. *Elliott Bay Seafoods, Inc. v. Port of Seattle*, 124 Wash. App. 5, 14-15 (2004). "Promises of future conduct may support a contract claim. But failure to perform those promises alone cannot establish the requisite negligence for negligent misrepresentation." *Micro Enhancement Intern., Inc. v. Coopers & Lybrand, LLP*, 110 Wash. App. 412, 436 (2002).

Plaintiff argues that AlarmSIM made false representations about the "capacities and suitability of AlarmSIM's SIM cards" and "AlarmSIM's ability

and willingness to provide 'top-notch' customer service to Fortress's customers."

ECF No. 125 at 19.  However, Plaintiff fails to offer facts to support this argument

or show how these statements were untrue or misleading when made.  *Id.*

Representations about "top-notch" customer service are the sort of "mere puffery"

that cannot be proven false and do not support a finding of an unfair or deceptive

action.  *Babb v. Regal Marine Indust., Inc.*, 179 Wash. App. 1036, 2014 WL

690154, at *3 (Feb. 20, 2014).  Although Plaintiff has produced evidence that some

of its customers reported dissatisfaction with AlarmSIM's customer service, it has

not produced evidence that AlarmSIM did not provide customer service to

Plaintiff's customers.  ECF No. 126 at 30, ¶ 50.  Plaintiff asserts Defendants' call

center was "nonexistent," but offers no facts to demonstrate that the call center did

not actually exist.  ECF No. 126 at 30, ¶ 51.  Plaintiff's general assertion that

Defendants' statements about the "capacities and suitability of AlarmSIM's SIM

cards" does not specifically identify what statement is false.  ECF No. 125 at 19.

To the extent Plaintiff argues that AlarmSIM's SIM cards were not suited to work

with Plaintiff's products, this argument is undercut by the evidence.  Plaintiff

continued to recommend Defendants' SIM cards for use in its products from 2013

through 2015.  ECF No. 114 at 4-5, ¶¶ 20, 27-28.  Mr. Hofeditz ran his own test

run of Defendants' SIM card to confirm that they would work with Plaintiff's

security system.  ECF No. 114 at 3, ¶ 12.  Some of Plaintiff's customers reported

problems with AlarmSIM SIM cards. ECF No. 126 at 29, ¶¶ 48-49. However, Plaintiff's employee Benjamin Murray testified that technical issues with SIM cards "were a very common thing," that the issue was not exclusive to AlarmSIM SIM cards, and that Plaintiff "had tons of customers that were using AlarmSIM SIM cards successfully that weren't having those issues." ECF No. 113-2 at 5.

Plaintiff may have produced evidence that some of its customers were dissatisfied with Defendants' products and customer service, but it has not presented evidence to show that Defendants' statements concerning the compatibility of its product with Plaintiff's product and Defendants' ability to provide customer service were literally false. "Hindsight does not render the statement of a proposed performance a falsehood when made." *Wessa*, 2006 WL 1418906, at *3. Moreover, the statements Plaintiff identifies as the subject of misrepresentation are promises of future performance, not statements of presently existing fact. *Micro Enhancement*, 110 Wash. App. at 436. Even construing the evidence in the light most favorable to Plaintiff, Plaintiff cannot show the falsity of the challenged statements. Defendants are entitled to summary judgment on Plaintiff's intentional and negligent misrepresentation claims.

### 6. *Claim Nine: Breach of Agreement*

Defendants move for summary judgment on Plaintiff's breach of agreement claim. ECF No. 113 at 22-24. A claim for breach of contract is actionable under

Washington law "if the contract imposes a duty, the duty is breached, and the breach proximately causes damage to the claimant." *Nw. Indep. Forest Mfrs. v. Dep't of Labor & Indus.*, 78 Wash. App. 707, 712 (1995) (citation omitted).

Defendants move for summary judgment on the grounds that there was no exchange of consideration or meeting of the minds, and therefore no contract, between the parties. ECF No. 113 at 22-24. "In any breach of contract action, the first question a reviewing court must answer is whether an enforceable contract has been created." *Storti v. Univ. of Washington*, 181 Wash. 2d 28, 35 (2014). A valid contract requires an offer, acceptance of the offer, and consideration. *Yakima Cty. (West Valley) Fire Protection Dist. No. 12 v. City of Yakima*, 122 Wash. 2d 371, 389-90 (1993). "An offer consists of a promise to render a stated performance in exchange for a return promise being given." *Pac. Cascade Corp. v. Nimmer*, 25 Wash. App. 552, 556 (1980). "Consideration may consist of an act, a forbearance, the creation, modification or destruction of a legal relationship, or a return promise given in exchange." *Emberson v. Harltey*, 52 Wash. App. 597, 601 (1988). "A promise for a promise is sufficient consideration to support a contract." *Omni Grp., Inc. v. Seattle-First Nat. Bank*, 32 Wash. App. 22, 24 (1982). "Whether a contract is supported by consideration is a question of law and may be properly determined by a court on summary judgment." *Nationwide Mut. Fire Ins. Co. v. Watson*, 120 Wash. 2d 178, 195 (1992).

Here, it is unclear whether a contract existed between the parties. Plaintiff asserts the parties formed a valid contract during a November 11, 2013 conversation between Mr. Guthrie and Mr. Hofeditz. Plaintiff asserts that Mr. Guthrie requested Plaintiff recommend AlarmSIM SIM cards to Plaintiff's customers, that Mr. Hofeditz promised that Fortress would recommend AlarmSIM SIM cards in exchange for AlarmSIM providing SIM cards, customer service, and a discount to Fortress's customers, and that Mr. Guthrie agreed to these terms. ECF No. 126 at 24-25, ¶¶ 9-15. Construing these facts in the light most favorable to Plaintiff, a reasonable jury could conclude that an oral contract existed between the parties.

Assuming a contract existed between the parties, a reasonable jury could conclude that the contract was breached. It is undisputed that AlarmSIM provided SIM cards to Fortress customers and that the SIM cards were generally compatible with Fortress's security systems. ECF No. 114 at 4, ¶ 20. Although the quality is disputed, it is undisputed that AlarmSIM provided customer support to its customers. ECF No. 126 at 30, ¶ 50. And it is undisputed that Fortress customers were able to use a discount code to receive a discount on AlarmSIM SIM cards. ECF No. 126 at 26, ¶ 24. However, Plaintiff has offered evidence that the terms of the contract were that Defendants would completely respond to Fortress customers' inquiries about AlarmSIM SIM cards and correct at AlarmSIM's

expense any issues Fortress customers experienced with AlarmSIM SIM cards. ECF No. 126 at 24, ¶ 12. Plaintiff has also alleged facts to demonstrate that Defendants did not adequately respond to Fortress customer inquiries and did not correct issues Fortress customers experienced with AlarmSIM's SIM cards. ECF No. 126 at 30, ¶¶ 50-53. Construing this evidence in the light most favorable to Plaintiff, a reasonable jury could conclude that the contract was breached. Defendants are not entitled to summary judgment on Plaintiff's breach of contract claim.

### 7. *Claim Ten: Washington Consumer Protection Act*

Defendants move for summary judgment on Plaintiff's Washington Consumer Protection Act ("CPA") claim. ECF No. 113 at 6-15. The elements of a CPA claim are: "(1) unfair or deceptive act or practice; (2) occurring in trade or commerce; (3) public interest impact; (4) injury to plaintiff in his or her business or property; (5) causation." *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wash. 2d 778, 780 (1986). "[A]n act or practice can be unfair without being deceptive …." *Klem v. Wash. Mut. Bank*, 176 Wash. 2d 771, 787 (2013). "A deceptive act must have the capacity to deceive a substantial portion of the population … and misleads or misrepresents something of material importance." *McDonald v. OneWest Bank, FSB*, 929 F. Supp. 2d 1079, 1097 (W.D. Wash. 2013) (internal quotes and citations omitted). "Whether an act is unfair or deceptive is a

question of law." *Id.* at 1097. However, when there is a dispute of fact as to the parties' underlying conduct, a court cannot determine whether conduct is unfair or deceptive as a matter of law. *Leingang v. Pierce Cty. Med. Bureau, Inc.*, 131 Wash. 2d 133, 150 (1997).

Plaintiff identifies statements in the allegedly defamatory email and the RHC website as violating the CPA. ECF No. 125 at 14. Genuine issues of fact preclude this Court from determining whether these statements are unfair or deceptive as a matter of law. As discussed *supra*, the statements at issue could reasonably interpreted as true or false. Additionally, the parties dispute how widely the allegedly defamatory email was distributed, the number of Plaintiff's customers who received the email, and the number of customers the parties had in common. *See* ECF No. 130 at 4, ¶ 5. These facts speak to whether the statements at issue had the capacity to deceive a substantial portion of the population. *McDonald*, 929 F. Supp. 2d at 1097. Because genuine issues of fact surround the underlying conduct, this Court cannot determine as a matter of law that the statements at issue are unfair or deceptive. Defendants are not entitled to summary judgment on this claim.

**ACCORDINGLY, IT IS HEREBY ORDERED:**

    1. Plaintiff's Motion to Exclude Expert Testimony of Scott Hampton (**ECF No. 102**) is **DENIED**.

2. Plaintiff's Motion to Exclude Expert Testimony of Nicholas Carroll (**ECF No. 104**) is **GRANTED IN PART and DENIED IN PART**.

3. Defendants' Motion to Exclude Expert Testimony of Hiren Modi (**ECF No. 116**) is **GRANTED IN PART and DENIED IN PART**.

4. Plaintiff's Motion for Partial Summary Judgment (**ECF No. 108**) is **DENIED**.

5. Defendants' Motion for Summary Judgment (**ECF No. 113**) is **GRANTED IN PART and DENIED IN PART**.

The District Court Executive is directed to enter this Order and furnish copies to counsel.

**DATED** December 5, 2019.



THOMAS O. RICE
Chief United States District Judge